STATE OF RHODE ISLAND *vs.* LAZAR FENIK.

JUNE 14, 1923.

PRESENT: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

*(1)  Criminal Law.  Homicide.  Evidence.  Insanity.*

On an indictment for murder, the defence being insanity, the evidence showing a basis for the claim that defendant, was suffering from mental disease not merely of a temporary and transient nature, but which might be found to be hereditary, it was error to exclude evidence offered to show insanity of a grandparent; in the family of defendant on both sides and of a sister of defendant's mother.  *State* v. *Quigley*, 26 R. I. 263, distinguished.

*(2)  Criminal Law.  Evidence.  Insanity.*

Evidence tending to show insanity in collateral kinsmen of an accused rests within reasonable limits in the reasonable discretion of the trial court, in view of the circumstances of each particular case.

*(3)  Criminal Law.  Murder in First and Second Degree.*

Pub. Laws, cap. 1258, § 6 (1915), relating to murder in the first and second degrees, requires that the premeditation necessary to establish the first degree of murder must be shown to have existed for more than a barely appreciable length of time before the killing; it must have had something more than a momentary existence.

*(4)  Criminal Law.  Murder.*

Under the statute relating to the crime of murder a jury may determine the degree of murder, whether the same is charged in the indictment or not.

*(5)  Criminal Law.  Murder.*

Where there was evidence of the absence of any settled purpose on the part of a defendant for any but a very brief time before the killing, the failure of the court to instruct the jury, when requested, in regard to murder in the second degree, was error.

*(6)  Criminal Law. · Burden of Proof.  Insanity.*

Charge that the burden of proving insanity by a fair preponderance of the evidence rested upon the defendant, was proper.

*(7)  Criminal Law.  Trial.  Comments of Court.*

Regardless of the opinion of the trial court as to the merits of a defence, it is its duty to exercise scrupulous care that the jury should not be influenced in its finding of fact by what they believe to be the opinion of the court. Evidence considered and held that defendant was prejudiced by the attitude and language of the trial court.

INDICTMENT charging murder.  Heard on exceptions of defendant and sustained.

STEARNS, J.   The defendant was indicted for the murder of his infant daughter, Judith, in the city of Newport March 31, 1920.   He was found guilty of murder in the first degree.   After denial of a motion for a new trial in the Superior Court, the case is in this court on defendant's bill of exceptions.

The defence was insanity.   The facts in regard to the homicide are not in dispute and are substantially as follows: Defendant at the time of the trial was 33 years of age.   He was born in Russia and came to this country in 1914; he was a musician and in New York was employed in the chorus of an opera company.   In 1917 he married an actress and subsequently with his wife moved from New York to Newport, where two children were born.   In Newport he was employed as an insurance solicitor.   The relations between defendant and his wife were at times strained and unhappy, due, as defendant claimed, largely to the desire of his wife to return to New York and resume her former work on the stage.   Mrs. Fenik, called as a witness by the state, testified that her husband had the "artistic temperament," that he was erratic, excitable, moody and at times despondent and very peculiar.

On the Saturday preceding the day of the homicide, which occurred on the Wednesday following, defendant went to Providence to attend a dinner given by his employer to certain of the company solicitors who had been exceptionally successful in the conduct of the company's business.   He was elated with this distinction.   On his return to Newport in the afternoon, he found his wife in his absence had sold most of the furniture in his house; the house was empty and his wife and children were gone.   Later he got possession of his children and made several attempts to place them in proper surroundings, in the expectation that he might induce his wife to return to him and again establish a home.   His wife refused to return to him; the youngest child was placed in a hospital and Judith, two and a half years old, was placed in the home of defendant's sister.   Defendant was devotedly

attached to his children and became much depressed by the situation. He was unable to eat or to sleep, he walked the streets and on Tuesday night, walked the floor of his tenement most of the night. He suffered from headache, his eyes were bloodshot, and his appearance was so changed and unusual as to attract the attention of his friends. On Wednesday morning, the day of the tragedy, he passed several friends and acquaintances and either refused or failed to recognize them. Shortly before noon, one of his friends, seeing him walking on the street with Judith, induced him to enter his automobile and then drove him with the child to defendant's home where he left them. Within a few minutes, the tenant on the floor below heard defendant shouting and screaming; going to the hall door, this witness looked up to the hall on the floor above where she saw defendant standing with the child in his arms, both father and child being covered with blood. The police were summoned and upon their entry into the house, father and child were found lying on a bed. Defendant had cut his own throat and the throat of his daughter with a razor. The Captain of Police testified the defendant at that time made certain statements to the effect that he intended to kill himself and his child; that his troubles were too much for him and that he wished to end it all. Defendant testified that he had no recollection of the tragedy and knew nothing of the occurrence until later he was told about it. At the hospital defendant, although not under the influence of any anæsthetic, sang songs from opera while the attending surgeon was sewing up his wounds. The surgeon stated that defendant at that time was abnormal. Two notes and fragments of other notes written by defendant were found in his room: one note was as follows: "Cant live and see the child suffering;" another, "will take the with me to save he from the hardship of this selfish world." The child Judith died a few days later.

The sole contested issue at the trial was the sanity of defendant and his legal responsibility for the homicide.

Numerous objections during the progress of the trial were taken by defendant, some of which have been waived. The other objections which we consider require specific discussion, for convenience and brevity are grouped into classes and will be considered on the general questions raised thereby.

Defendant had testified that when he was living with his parents in Russia, his father was, as he expressed it, "inclined to melancholia." He was then asked if there was any insanity on his mother's side. This question was ruled out (1) by the trial justice. The court later ruled that testimony of insanity of either father or mother would be allowed, but as to relatives beyond that it was too remote. Counsel for defence then stated that he desired to offer proof of insanity of defendant's grandfather. This was not allowed and the offer was then made of proof of insanity in the family of defendant on both sides and this also was ruled out, as was also an offer of proof of insanity of the sister of defendant's mother. The trial justice based his rulings in rejecting the above-mentioned testimony, as he said, on the ground that it was too remote. The reason for this ruling is stated again in the charge to the jury, as follows: "The prior insanity of the accused, if he ever was insane, his previous mental condition—not too remote in point of time,—are always relevant." The exclusion of this testimony was error. From the evidence already in the case at the time, it is apparent that there was some basis for the claim that defendant was suffering from mental disease or insanity, not merely of a temporary and transient nature but which might be found to be hereditary. Proof of the possibility of such an inheritance from the parents would be strengthened by proof of insanity in one or both of the grandparents. Such evidence is admissible both on principal and authority and so far as we are informed such has been the accepted practice in this State. *State* v. *Quigley*, 26 R. I. 263, is not an authority to the contrary. In the *Quigley* case the defendant claimed to be suffering from delirium tremens at the time of the homicide. This was a temporary condition

voluntarily produced by the defendant and was not the result of inheritance. There was no claim that defendant had ever suffered from any inherited mental disease or that the alleged mental disease was anything more than a temporary disturbance. To exclude testimony of insanity in the direct lineal line of the accused's ancestors in the present case might result in depriving both the jury and medical witnesses of evidence of value and might result in grave injustice to the accused. In regard to the admissibility of evidence of insanity in collateral kinsmen a more difficult question is presented, and within reasonable limits much must be left to the reasonable discretion of the trial justice in view of the circumstances of each particular case. In the case at bar, we think proof of insanity of defendant's aunt was improperly excluded. The exceptions on this point are sustained.

(2)

The next ground of exception is to the charge of the court in regard to the definition of "murder" and to the refusal to give proper instructions in regard to the distinction between murder in the first and second degree. This part of the charge is as follows: "Murder is defined in the statute as this; it is the unlawful killing of a human being with malice aforethought; and if you should find the defendant guilty of murder, the question then arises whether you would find him guilty of murder in the first or second degree. I will say that every kind of wilful, malicious, deliberate and premeditated killing is murder in the first degree—and any other kind of murder is murder in the second degree."

(3)

Section 6, Chap. 1258, Pub. Laws, 1915, provides as follows: "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson, rape, burglary or robbery; or perpetrated from a premeditated design, unlawfully and maliciously to effect the death of any human being other than him who is killed, is

murder in the first degree. Any other murder is murder in the second degree." From a comparison of the charge and the statute it appears that the court read to the jury from the above statute the definition of murder, then a part of the definition of murder in the first degree, and the statutory clause in regard to murder in the second degree. Although requested by the defence, no other explanation or definition of murder in the second degree was given.

By the state it is urged that a charge in regard to murder in the second degree was not required as the defendant was either guilty of murder in the first degree or not guilty by reason of insanity. It is conceded that the court only charged the jury on murder in the first degree.

(4) The statute specifically provides that the jury may determine the degree of murder, "whether the same be charged in the indictment or not." Prior to the enactment of Chapter 1258, unlawful homicide was either murder or manslaughter. Said statute established two degrees of murder with a different penalty for each offence. The statutes now divide unlawful homicide into three classes, namely: manslaughter (Sec. 3, Chap. 343, Gen. Laws), which is not defined by statute and hence is, as at common law, any unlawful killing without malice aforethought; and murder, in the first and second degree. The definition of murder in Chapter 1258 is the one long established under the common law.

The controlling distinction between murder and manslaughter still, as at common law, depends on the existence or absence of malice aforethought. It is difficult to draw a line with precision between the two statutory degrees of murder, as the language of the act is somewhat indefinite and lacking in certainty. It is to be noted that murder is first defined. Then follows a definition in detail of murder in the first degree. It is reasonable to suppose that thereby it was the intention to add something to or qualify the definition of murder given in the statute just preceding, as otherwise the creation of two degrees of murder, the greater and lesser, is meaningless and ineffective. At common law

the conscious design or intent need not have been entertained for any considerable period prior to the act of killing; it was sufficient to make the offence murder if the intent was formed and existed for any length of time, however short, prior to the killing. From the fact that the premeditation and deliberation accompanying the act of killing which constitutes murder in the first degree is connected in the same clause with the intention referred to in cases of poisoning and lying in wait, we think the premeditation necessary to establish the first degree of murder must be shown to have existed for more than a barely appreciable length of time before the killing. That is it must have had something more than a momentary existence.

There is evidence in this case which would warrant a verdict of murder in the second degree. The notes were written apparently after defendant had returned to his home and after his friend had left him. Assuming that defendant was not insane, there is evidence that he was not in his normal mental state. This fact, although not an excuse for the homicide, is relevant on the question of the fixity and duration of the conscious intent or premeditation. Considered in connection with the fact that defendant had written and torn up several notes, in an interval of not more than ten minutes after the departure of his friend and the time of the killing, it may fairly be argued that there is evidence of vacillation and an absence of any settled purpose for any but a very brief time before the killing. Such being the case, the failure to instruct the jury in regard to murder in the second degree was error.

The jury were properly instructed that the burden of proving insanity by a fair preponderance of evidence rested upon the defendant. *State* v. *Quigley, supra*. The exception to this part of the charge is overruled.

The expert medical witnesses called by the State and the defence were in agreement to this extent: that defendant at the time of the killing knew the difference between right and wrong; that defendant came to a decision in regard to

his conduct and that he knew his act was wrong.   The charge
of the court on the question of insanity was sufficient and the
exceptions thereto are overruled.

During the course of the trial numerous exceptions were
taken by defendant to remarks and comments made by the
trial justice concerning defendant and his attorneys and to
the attitude of the court, which it is claimed were improper,
and prejudicial to the defendant and tended to injure him
in the estimation of the jury.   We have no means of passing
on the merits of these objections except by the record in the
transcript of the testimony.   We have examined this record
with care.   In considering this class of objections we have
tried to view each objection in its proper setting and in
connection with all the facts, and to weigh the objections
having due regard to the nervous strain under which both
court and counsel are often laboring in the course of a long
and hard fought contest.   The responsibility for the prompt
and orderly conduct of the trial and the preservation of
decorum in the court room rests on the trial justice and we
are not disposed to look with too critical an eye at every
departure from perfect judicial poise, as experience shows
that not infrequently counsel in their zeal for their clients'
interests are unmindful of the consideration due to the court.
But there is nothing in the record which shows that counsel
for the defence or the defendant were lacking in proper
respect for the dignity of the court or that they were guilty
of any conduct which called for censure from the court.

After an examination of some twenty or more exceptions
of this class we are of the opinion that defendant's exceptions
are substantial and that defendant was prejudiced and the
full enjoyment of his rights was impaired by the acts com-
plained of.   The trial justice apparently questioned the fact
of the alleged insanity.   Regardless of the soundness of his
conclusion, it was his duty to exercise scrupulous care that
the jury should not be influenced in their finding of fact by
what they believed to be the opinion of the judge.   From
the record the conclusion is unavoidable that the trial justice

had a poor opinion of the character of the defendant. The jury undoubtedly observed this. When defendant was on the stand and was talking about his daughter Judith, he was addressed by the court as follows: "THE COURT: Come, restrain yourself as much as possible. Be a man. Brace up." The record shows no cause for such an admonition. Again defendant in narrating certain facts was rebuked by the court for his failure to state them briefly, the court remarking "he apparently has a very encyclopedic mind." Again, defendant, in concluding an answer, referred to the fact of his position, standing in court and accused of murder of his own child—"THE COURT: Don't go into that, your counsel will attend to that part of it for you." Defendant was asked by his counsel if the conduct of his daughter in playing in the empty house had affected him at all, to which he replied that it affected him very much. "THE COURT: You will omit those details and the feeling and the pathos. Just ask the bare facts. It is not necessary to recall those details. Just ask him the bare facts."

Defendant claimed that his wife's relations with another man prior to her marriage had been improper and that he feared the influence of this man might again be exercised on his wife; that this was one great cause of his mental disturbance. In cross-examination defendant was asked if he had not lived with a woman not his wife, before marriage. Counsel for defence objected, that it was irrelevant. "THE COURT: It would be ordinarily but you have gone into the relations of Mrs. Fenik with another man and the effect it had upon him. Now if he had been doing the same thing, the effect on him wasn't as great as it might be supposed to be, that is all, Mr. Nolan. Of course, those who live in glass houses can not throw many stones."

A witness for the defence was asked to state what he knew of defendant and his early life in Russia. Objection was taken by the state on the ground that the evidence was immaterial. The court ruled that events and environment of defendant affecting his mental condition should be re-

stricted to a reasonable time, within a few years, that he saw no need to going back to defendant's childhood; that "everybody has ambitions and hopes but it is not considered significant for that reason that we should go into the early history of every criminal." Counsel for defendant at once objected to this statement of the court on the ground that the statement of the court implied that defendant was a proven criminal. The court then said, "no I should have said every alleged criminal." This remark although at once changed was unfortunate for defendant and taken in connection with the other incidents referred to must have had a harmful effect on the defendant's case.

It is unnecessary to consider the other exceptions.

For the reasons given certain of the exceptions of the defendant are sustained. The other exceptions are overruled and the case is remitted to the Superior Court for a new trial.

*Herbert L. Carpenter, Attorney General,* for State. *Charles P. Sisson,* of counsel.

*Frank F. Nolan, Max Levy,* for defendant.