STATE *vs.* HAROLD C. McGREGOR.

JANUARY 28, 1955.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

438

FLYNN, C. J. This indictment charges the defendant with committing murder in the first degree. The case was tried in the superior court before a jury who returned a verdict of guilty as charged. Thereafter the trial justice denied the defendant's motion for a new trial and the case is here on a bill of exceptions to that decision and to other evidentiary rulings made during the course of the trial.

Apart from the medical testimony and opinions of expert witnesses, the material and relevant facts are substantially undisputed. The defendant, who was separated but not divorced from his wife, had been living for six to eight years intimately with another woman, who operated a rooming house. The latter had informed him that she intended to break up their relationship and to accept the offer of a legitimate marriage presently proposed by another man. On Sunday, September 5, 1948, defendant discussed with her certain financial and other benefits which she would derive from such a marriage and they agreed it would be better if in the circumstances he moved from the house.

There was further discussion by them that same night, which defendant spent with her in a cabin in Plainville,

Massachusetts. They came back Monday and that night he left her house and did not return. On Tuesday morning, September 7, 1948, he telephoned to her to inquire as to the progress of the proposed marriage, and on Wednesday morning in another telephone conversation he asked her to meet him that day to discuss a letter he had previously mailed to her concerning his personal business and financial status. Accordingly an appointment was made to meet her at 3 p. m.

Just before keeping such appointment he telephoned, between 1:30 and 1:45 p.m., to an undertaker with whom he had been well acquainted for eighteen or twenty years. He first inquired for the health of the undertaker's wife, who had been hospitalized. He then asked for information concerning the location of a human heart, giving as the reason for such inquiry that he wanted to settle a small wager of fifty cents as to its exact location. This information was given by the undertaker to the defendant, who then inquired as to whether a woman's heart was located in the same part of the anatomy as that of a man. Upon receipt of an answer that both were similarly located he went to his automobile and proceeded to drive it to keep the above-mentioned appointment. Prior thereto, however, at some time during that day he also had taken a large ice pick from his office and placed it in the automobile.

He met the woman shortly before 3 p.m. on Broad street in the city of Providence and, according to him, drove generally in the direction of Beach Pond in this state. They had gone there for picnics at other times and apparently he thought they might discuss their affairs with more privacy than if they stopped on the street to talk. However, when defendant's automobile was going along Cranston street in the city of Cranston about 3 p.m. he suddenly grabbed the ice pick and stabbed the woman in the chest near the heart. The car, after traveling in an erratic course, came to a stop near a gasoline station at Pavilion avenue. The woman jumped out, screaming that she had

been stabbed. The ice pick was either projecting from her chest or had just been removed by her. At any rate she handed it to one of the gasoline station attendants, who helped to support her from falling.

At the time, a police officer on duty happened to be near. He had observed the erratic course of the car and saw the woman as she jumped out and handed the ice pick to the attendant. He also heard her state that she had been stabbed by the man in the car. Immediately after she had jumped from the car the defendant was heard by one of the gasoline station attendants to say: "Officer pull me in, I just stabbed a woman." As the officer went to defendant's automobile to take him into custody, two other police officers were passing in a patrol car and stopped to investigate. When defendant was actually in custody, he complained to the officer: "Why don't you let me go so I can kill myself."

The woman was taken directly to a hospital in Providence for treatment. Later that day defendant was brought to the hospital where he was identified by her. She then asked him why he had done such a thing, and his reply was in effect that he had done it because he loved her. Thereafter, within a few hours of the assault, the woman died at the hospital from the wounds inflicted by defendant during the attack.

Subsequently that evening defendant was questioned further at police headquarters. A statement containing questions by the police and the answers thereto as given by defendant was typewritten. After reading it and making a certain correction, which he initialed, and personally writing in his answer to the last question, the statement was signed by defendant on September 8, 1948 in the presence of three police officers. The last question in the statement is whether it was true and given of his own free will, without fear or promise on the part of the police, to which he answered in his own handwriting: "Yes." The statement, which corroborated in further detail the facts relevant to

defendant's history, motive, plan and conduct just before and at the time of the fatal assault, was introduced without objection as defendant's confession.

On September 9 defendant in due course was transferred to the Providence county jail to await trial. Thereafter, on the morning of September 17, he fell or jumped from a third tier cell in an attempt, as he later claimed, to commit suicide in accordance with part of his plan to do away with himself after killing the woman. As a result of this incident he was examined for mental disorder or illness. Thereupon a petition of the welfare department supported by the certificates of two doctors was filed and he was transferred in accordance with law to the state hospital for the criminally insane by order of a justice of the superior court September 23, 1948. There he received medical treatment for shock and fractures of a lumbar vertebra and certain bones of the leg as well as treatment for such mental condition as was found to exist at that time.

On December 14 of that year a clinic was held at which defendant was observed and studied further by many of the staff doctors at the state hospital for mental diseases. It was determined that, although defendant had exhibited some symptoms of a possible *psychopathic* personality, he was not then suffering from any mental disorder or disease that would warrant his further confinement at the hospital. However, he remained there until June 25, 1949, when it was officially and formally determined that he had recovered mentally to the extent that he was competent to stand trial and that it was safe to return him from the state hospital for mental diseases to the jail. Accordingly he was then returned and was later tried and convicted on the instant indictment.

The above is a brief and general summary of the salient facts, none of which is disputed by defendant. His defense was based solely on a special plea that he was insane at the time of the commission of the fatal assault. Evidence

was presented on this issue by the defendant and by the state through medical testimony and expert witnesses.

It will serve no purpose to attempt to state in detail the complicated and at times confusing testimony and opinions of the different doctors, psychiatrists and neurologists. Suffice it to say, without great refinement, that the medical experts appearing for defendant testified in substance that he was probably suffering from a schizophrenic disorder for some years; that he had been suffering a gradual and progressive deterioration of the brain from disease for at least seven years; and that the feeling that he was losing the woman whom he said he had hoped to marry, coupled with his business and financial depression, had left him desperate and caused a sudden terrific emotional conflict which subjected him to an irresistible impulse, thus rendering him for the moment irresponsible for his act.

In other words, they conceded that at· the time he may have known the difference between right and wrong as well as the nature, quality and consequences of the act which he was perpetrating, and that he knew he should not have done it; but according to some of them he was unable, because of this emotional upset, to choose between the alternatives of right and wrong doing. Therefore in their opinion defendant, being unable to resist such emotional impulse and to make a choice, was insane at the time of the act.

On the other hand the state presented several doctors who were in attendance at the state hospital for mental diseases, some of whom had examined defendant at the time of admission and others who had either examined him on other occasions or had been present at clinics where he was observed while his mental health was under investigation and consideration. These medical witnesses and experts were of the opinion in general that defendant was not insane on September 8, 1948 when he stabbed his woman companion; that at that time he was not suffering from a defect of reasoning due to disease of the mind so as to

render him incapable of distinguishing between right and wrong and of knowing the nature and quality of his acts; and that there was no sufficient basis in his history, actual mental condition or conduct to warrant a conclusion that on September 8, 1948 he was deprived by any mental disease or disorder of his ability to reason and to know the difference between right and wrong, as well as the nature, quality and consequences of his acts.

In their opinion defendant may have had some possible mental deterioration but it was not such as to deprive him of his reasoning and will power on September 8, 1948; and the symptoms disclosing a probable psychopathic personality or an emotional disorder on September 24, 1948 did not support a conclusion that he was *insane* and therefore irresponsible as of September 8. They distinguished between defendant's condition which justified his transfer to the criminally insane ward for the purposes of safety and examination for a *possible* mental ailment, which was routine in cases following attempted suicide, and a definitive defect or disorder of the mind due to disease which would constitute insanity in a social and legal sense.

It was their conclusion that any supposed lighting up or onset of an emotional or other mental disorder appeared only *after* he had been in jail for eight or nine days; that this was probably due to his contemplation of the consequences of his act, the experience of a fear that he might be unable to adjust himself to his possible future confinement, and the remorse that followed his reflection on the commission of such a crime. These factors, together with the physical and mental shock resulting when he fell or jumped from the cell tier, all of which took place eight days or more *after* the assault, were found by them to be the adequate causes of any mental disorder which prompted his transfer to the criminally insane ward but were *not* retroactive to show *insanity* as of September 8. It was also their opinion that defendant had recovered from any possible personality defect or emotional instability

to such an extent that he was competent to stand trial and also to show that he was not insane on September 8, 1948 so as to be irresponsible for his act.

The results of various examinations by psychiatrists, psychologists, and a psychometrist were also in evidence and showed defendant to be above average in some respects and below in others according to the standards used. The contents of his signed confession and the evidence relating thereto clearly indicate that it was intelligently, understandingly and voluntarily executed. The defendant at all times was represented by counsel and it is not claimed here that he was deprived of a full and fair trial.

The bill of exceptions contains seventy exceptions, of which thirty-one are specifically waived but at least two of these are later argued in his brief. Certain others are not specifically waived, but they are deemed to be waived since they are neither briefed nor argued. The exceptions as stated in defendant's brief generally are not correctly identified with those in his bill, thus creating a great deal of unnecessary confusion, difficulty and delay for this court. However, we have examined the substance of the exceptions which are argued in his brief and shall treat them in groups where possible in accordance with principles of law underlying defendant's chief contentions.

The first group of exceptions deals with the refusal to admit in evidence defendant's exhibit 3 for identification. This exhibit consists of a letter from the warden attesting the confinement of defendant at the state hospital for mental diseases, a petition by the department of social welfare based on the certificate of two doctors, and a decree of the superior court of September 23, 1948 ordering defendant's committal to such hospital in accordance with the statute.

The defendant contends that these records are admissible on the grounds that they are official records kept in the ordinary course of business and that they constitute an official court record. The mere fact that they might be

such official or court records, without more, would not entitle them to admission in evidence in a criminal case. Where they contain, as here, matters of conclusion and expert opinion without showing the facts upon which such opinions are based or without presenting for examination the person who gave the opinion, their exclusion would be warranted. The mere conclusions and opinions as set forth in the exhibit without any basic facts would not of themselves be competent in a criminal case to establish the fact of defendant's mental condition as of the date of the assault. Moreover without the presence as a witness of the person who gave the opinion, their admission would deprive the adversary party of the right to cross-examination. This group of exceptions is therefore without merit.

A similar claim is made by defendant as to the exclusion of exhibit 6 for identification, that being the complete hospital record. It was offered first as a full exhibit and subsequently certain pages thereof were offered separately, and the exclusion of the latter are the bases of several other exceptions. As a whole the record contains many entries by several different doctors and others, which entries included hearsay, conclusions and expert opinions. Some of these apparently are even based on opinions of other persons without the pertinent facts upon which either of such opinions was based. The file includes self-serving letters and other irrelevant matters that would not be admissible in any event.

In our opinion it was not error to exclude such a file of evidence. It would only confuse the jury with some evidence which was neither relevant nor material to the issue then being tried and it did not comply with the requirements in State v. Guaraneri, 59 R. I. 173. In any event all the salient facts therein which were admissible under accepted rules of evidence were ultimately introduced in testimony. Therefore the mere exclusion of the written evidence thereof, even where certain individual sheets contained no other

irrelevant facts, was not prejudicial error. This group of exceptions is overruled.

The defendant's next group of exceptions relates to the refusal to admit in evidence certain records of a mental hospital concerning the mother and an uncle of defendant. Under such an indictment and plea, evidence of insanity in direct and collateral kinsmen of an accused may be admissible in a particular case as bearing upon the mental condition of a defendant; but such evidence is within the reasonable discretion of the trial court. *State* v. *Fenik,* 45 R. I. 309, 313. In the instant case the facts relating to the mental health and the commitment of defendant's mother and her brother to certain mental hospitals were actually in testimony. But the hospital records of those cases, which contained hearsay statements and opinions of different experts without showing the facts upon which those opinions were based and without presenting the individuals who made the entries, rendered such written records inadmissible. Moreover since defendant had the benefit in evidence of all the essential facts contained in such records so far as they were material and relevant, there was no possible prejudice in excluding all of such records. These exceptions are overruled.

Another exception deals with certain cross-examination of one of defendant's medical experts. He had testified two weeks previously, in a proceeding to establish defendant's ability to stand trial, in substance that defendant was undergoing a general gradual deterioration of his mind and brain. The cross-examination was clearly directed to bring out an alleged inconsistency between the effect of such testimony and that which the same witness had given in the instant trial. In our opinion such examination had a direct bearing on the weight to be given his present testimony and there is no error in the ruling permitting this cross-examination. The exception is overruled.

Under another exception defendant complains of the court's ruling in refusing to admit an opinion expressed by

Dr. Herbert Cronick as a result of the clinic held on December 14, 1948. Assuming that defendant's examination at that stage was permissible to impeach the witness, who was not then appearing as an expert but as defendant's own witness, the testimony was nevertheless inadmissible. It is clear that the doctor's opinion at that time was admittedly based on a summary reported by another "from various material gathered, from reports, from anyone who has had any contact with the case previously, which is compiled in a case history, and that was read at the staff conference * * *." It was not an opinion based on any personal examination by that reporter or by this witness. Nor was it based on questions to defendant by other doctors in the hearing of such reporter or the witness. But it was predicated on certain facts and opinions as summarized by a third person from collected information, whether relevant or irrelevant, some of which at least would not be admissible in any event. This exception is overruled.

The defendant further contends under another exception that the court improperly refused to allow a certain question in cross-examination of Dr. Ernest Quesnel. He was asked if in transferring defendant to the criminally insane ward he had in mind "whether or not the Defendant was laboring under such a defect of reasoning due to disease of the mind so as not to know the nature and quality of the act he was committing, and so as not to know that it was wrong?" We find no error in this ruling because first, the doctor at that time was not qualified or testifying as an expert; second, the question did not ask for but assumed an opinion; third, the opinion if asked or assumed was as to a condition of defendant on September 20 or 24, 1948, whereas the real issue was whether he was insane on September 8, 1948; and fourth, the requested information found its way in substance into testimony after the doctor was later qualified as an expert. He then explained and gave essentially his opinion of defendant's knowledge of the nature of his acts as to right and wrong on September 20 or 24, which was the

question originally excluded, and also as of September 8, which was the real issue. This exception is overruled.

A further exception deals with a hypothetical question to Dr. Quesnel which was propounded by the state and which included as a basis all the material facts in evidence up to and including the assault. In our judgment there was no error in permitting such question. It was not the duty of the state in presenting its case to negative in advance an alleged mental condition of defendant which was first brought into issue in defense by his special plea of insanity. Furthermore, in our opinion all the facts which were material, relevant and probative of defendant's mental condition on the day of the assault were subsequently in testimony before the jury by hypothetical questions or otherwise. In any event we are of the opinion there was no prejudicial error in permitting this hypothetical question, and the exception is overruled.

The final exception is to the ruling of the trial justice denying defendant's motion for a new trial. No exception to the charge as given was taken by defendant and at the conclusion thereof defendant's counsel stated: "On behalf of the Defendant I would like to say that we had a fair trial at your hands." The charge of the court had adopted the rule or test as to a defendant's alleged insanity which is applied generally and which is referred to in *State* v. *Quigley*, 26 R. I. 263.

The defendant's counsel concedes that thereunder he had the burden to establish by evidence the alleged insanity of defendant on September 8, 1948. But he contends the evidence clearly preponderates in favor of the conclusion that on September 8, 1948 defendant was insane; that he then suffered from a disease of the mind which deprived him of his reasoning and will power; and that he did not know the nature and quality of his act, the consequences thereof, and the difference between right and wrong as required under the rule as charged.

We have examined the evidence and it is not easy to follow the complicated terminology, explanations and gratuitous assertions employed by the separate psychologists, psychiatrists, neurologists and the psychometrist. At times the conclusions apparently stated by some of these witnesses are wholly opposed to the undisputed facts in this case and the reasonable deductions therefrom. In the circumstances it is entirely understandable how a jury might not credit them to the extent claimed for defendant but on the contrary would draw its conclusions according to normal standards, reasonable experience and in conformity with undisputed facts. Such conclusions also find confirmation in the evidence of the experts offered by the state. In our judgment whatever some of the expert witnesses by a process of abstract speculation may have felt the defendant's mental condition was on September 8, there was ample evidence to prove beyond a reasonable doubt that he was not insane on that date as he alleged and therefore that he was responsible for his act, as the jury concluded.

At all times until September 17, which was eight or more days after the assault, defendant had displayed no signs of any terrific emotional upsets or violent conflicts that would deprive him of his ability to reason and his will power; or that would prevent him from knowing and appreciating the nature, quality and consequences of his acts, and the distinction between right and wrong; or that would deprive him of an ability to choose between alternatives as alleged by some of the expert witnesses for defendant. He had displayed, according to the undisputed evidence and reasonable standards, adequate powers of apprehension, reasoning, understanding, memorizing, orienting, co-ordinating, planning, controlling and executing his own acts before and immediately after the assault. These entirely refute the concept born of extreme abstract speculation concerning defendant's mental condition as offered by experts to show that he may have been irresponsible on the date when he assaulted the victim.

In our judgment the jury had ample evidence to draw the conclusion that beyond a reasonable doubt the defendant knowingly, freely and calmly calculated and deliberately planned the events leading up to and including the assault with the intention of killing his woman companion. From an examination of all the evidence we cannot say that the trial justice misconceived the law or facts in independently approving the verdict and in denying the motion for a new trial. This exception is therefore overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*William E. Powers,* Atty. Gen., *Francis J. Fazzano,* Ass't Atty. Gen., *for State.*

*Robert T. Flynn,* for defendant.