**STATE**

v.

**Douglas MALLETT.**

No. 90–524–C.A.

Supreme Court of Rhode Island.

Dec. 5, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the defendant's appeal from a judgment of conviction of first-degree murder in the Superior Court. We affirm.

Peter Willard (Willard) died on the morning of April 10, 1988, as a result of several blows to his head by a blunt object. After investigation Providence police arrested defendant, Douglas Mallett (Mallett), and he was indicted by the grand jury of Providence County on a charge of murder. At trial the jury found Mallett guilty of first-degree murder. He was sentenced to life imprisonment.

Evidence introduced at trial established that Willard had resided in apartment 2 on the first floor of an apartment building located on 1427 Westminster Street in Providence, Rhode Island. The defendant also lived in that neighborhood.

In the final hours of April 9, 1988, Steven Stewart (Stewart), a man on a "mission," [1] met up with defendant. Stewart had been smoking free-based cocaine for two straight days. He invited defendant to join him on his "mission." The defendant accepted the invitation, and together they headed to the third floor apartment of Lillian Marsden (Marsden) at 1427 Westminster Street. When defendant and Stewart arrived at apartment 18, all three began a cocaine-smoking marathon that lasted through the early morning hours of April 10. At times during the course of that night other people, like the building manager George DePasquale, visited Marsden's apartment.

The defendant and Stewart left Marsden's apartment on two separate occasions to obtain more cocaine. Both times they left 1427 Westminster Street, defendant and Stewart broke into nearby drug stores and stole cartons of cigarettes. The cartons of cigarettes were sold to raise money to buy cocaine.

The defendant cut his forearm during the second break-in. Stewart wrapped defendant's forearm with a white bandage, and then they headed back to 1427 Westminster Street. As Stewart and defendant reentered the apartment building, they encountered Willard, Michael Gomes (Gomes), and Marsden arguing about something in the first-floor hallway. The defendant became involved in the argument and scuffled with Willard. Before Gomes could restrain defendant with a bear hug, defendant punched Willard a few times.

Stewart asked defendant why he wanted to bother with a drunk. The defendant explained that Willard had been hassling him all night long. Tempers cooled, and defendant, Stewart, and Marsden returned to apartment 18 to free-base and smoke more cocaine.

After smoking the newly acquired cocaine, defendant stood up and walked to the apartment door. As he left the apartment, defendant told Stewart, "[W]ait here, I will be back."

---

**1.** We understand that a "mission" is the search for, the location of, and then the consumption of drugs.

Carol DiPina Sheed (Sheed), a resident of 1427 Westminster Street, stood by the second-floor hallway window. A prostitute and drug addict, Sheed was waiting for her 10 a.m. "date." Her private thoughts were abruptly interrupted by a thump and epithets yelled by someone on the first floor. Sheed walked over to the stairwell, leaned over the banister, and saw defendant rob and then beat Willard with what looked like a window-sash weight. She fled to Clyde Gillespie's (Gillespie) apartment at the back of the second floor. As she stood in Gillespie's apartment, Sheed heard footsteps as someone ran up the front stairs, paused for a few seconds in the second-floor hallway, and then ran up the backstairs to the third floor.

The defendant returned to Marsden's apartment about five to ten minutes after he had left it. He appeared to be out of breath and eager to leave the building. The defendant handed $36 to Stewart. At trial, Stewart testified that he noticed that there was blood on the money and that the white bandage was missing from defendant's cut forearm.

Stewart and defendant left Marsden's apartment and descended the backstairs to the second-floor landing. After a brief discussion Stewart agreed to find a taxi cab, while defendant waited there for him. Stewart observed two things as he left in search of a taxi cab: (1) the white bandage he had used to wrap defendant's cut arm was lying on the floor of the second-floor hallway and (2) Willard was lying apparently unconscious and bloody in the first-floor foyer. Stewart did not stop to assist Willard; instead he went for a cab.

A few minutes later Stewart returned to 1427 Westminster Street with a taxi cab. The defendant left the building by the front entrance and entered the cab. As they were riding along, defendant admitted to Stewart that he had robbed someone to get the $36. The defendant also told Stewart he "banged the old man."

## I

The first issue raised by defendant is whether the trial court was in error when it permitted Lieutenant Paul A. Rossiter of the Providence Fire Department to testify concerning the time of death of the victim.

The defendant argues that an opinion concerning the time of death calls for expert testimony. In order for an individual to qualify as an expert, a foundation must be laid that establishes competency. According to defendant, the record establishes that Lieutenant Rossiter's training and experience is limited to rendering emergency aid. Therefore, the trial court abused its discretion by permitting Lieutenant Rossiter, who is not competent in the field of determining time of death, to render such an opinion. The defendant asserts that this abuse of discretion was not harmless error. According to defendant, Lieutenant Rossiter's testimony corroborated the state's critical witness, Carol DiPina Sheed, who was an otherwise noncredible witness due to her poor memory.

The state argues that because of Lieutenant Rossiter's medical training he was competent to render an opinion about how long it takes for the pupil to become dilated and fixed after blood flow to the brain has stopped. According to the state, such testimony had the same effect as rendering an opinion about the victim's time of death. The state further argues that if there was an abuse of discretion by the trial court it was harmless error because several witnesses corroborated Sheed's testimony.

In *State v. Fogarty*, 433 A.2d 972 (R.I.1981), we favored the more progressive view of Rule 701 of the Federal Rules of Evidence. That view would "allow the short-hand rendition of such external appearances as intoxication by lay witnesses as long as the witness has had an opportunity to observe the person and to give the concrete details on which the inference or description is founded." *Id.* at 976 (citing *McCormick's Handbook of the Law of Evidence*, § 11 at 25–26 (2d Ed. Cleary 1972)). We have since adopted the Rhode Island Rules of Evidence, which are modeled on the Federal Rules of Evidence. Rule 701 of the Rhode Island Rules of Evidence states the following:

"Opinion testimony by lay witnesses.—If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

■ The decision to permit opinion testimony by a lay witness is within the sound discretion of the trial court. Review of the trial court's decision is limited to determining whether the trial court abused its discretion.

■ At trial Lieutenant Rossiter testified about his emergency-medical-treatment (EMT) training. He had successfully completed the EMT ambulance course (120 hours of study), the EMT intermediate course (25 hours of training), and an EMT program at the cardiac level (180 hours of training). He has pursued further training since completing the above EMT courses.

On direct examination by the state Lieutenant Rossiter described what happened when he arrived at 1427 Westminster Street on April 10, 1988, at around 11:05 a.m. He observed Willard lying face up and covered with blood. After performing a check of Willard's vital signs Lieutenant Rossiter noted there was no respiration and no pulse and that Willard's pupils were dilated and fixed. Lieutenant Rossiter testified that approximately ten minutes after the blood flow to the brain stops, the already dilated pupils become fixed. The state asked the following question: "Based on your experience and your medical training, can you estimate approximately or give us a range as to how long Mr. Willard had been dead when you arrived there approximately shortly after eleven o'clock." Defense counsel objected to the question, stating, "I don't know if he's qualified to give an opinion." The trial court overruled the objection and permitted Lieutenant Rossiter to answer the question. Lieutenant Rossiter answered the question as follows: "My estimation would be under 15 minutes due to the fact that the blood was still wet, and I am not exactly sure but if you are looking for the fact whether he had been there all night or not, he definitely was not there all night. This was he died a relatively short time before we arrived." Lieutenant Rossiter's medical training, coupled with his observations about the victim's condition and the blood's still being wet, provides more than enough facts to conclude that his testimony was rationally based upon his perceptions. His conclusion was helpful to the determination of when the victim may have died and therefore was properly allowed.

## II

The next issue raised is whether the trial court erred in permitting Providence police detective Walter Williams to testify about the results of serology tests conducted by Special Agent Michael Vick of the Federal Bureau of Investigation (FBI).

The defendant argues that Detective Williams's testimony about the results of serology tests was inadmissible hearsay. He argues that the trial court's error was highly prejudicial because it corroborated Sheed's testimony with a trail of blood running from the first floor to the third floor.

The state argues that the expert's report is admissible under Rule 803(6) or 803(8)(B) of the Rhode Island Rules of Evidence. Since the report is admissible, the state argues that the trial court did not err by permitting Detective Williams to testify about the test results.

As we have noted above, the decision to admit evidence at trial is within the sound discretion of the trial court. Our review of the trial court's decision is limited to determining whether there is an abuse of discretion.

■ Hearsay is defined by Rule 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." An example of hearsay is a police officer's testifying about the results of a state toxicologist's report. *See State v. Welch*, 114 R.I. 187, 191, 330 A.2d 400, 402 (1975). Under Rule

802 hearsay evidence is not admissible unless it falls within an exception.

 Special Agent Vick of the FBI performed serology tests on several items, including a sample of blood-stained wallpaper from the first-floor foyer and a scraping from a blood smear discovered on the doorjamb to apartment 18 on the third floor. Examination and cross-examination of Special Agent Vick did not address tests performed on these specific items. Nor did direct examination of Detective Williams of the Providence police department. On cross-examination defendant asked Detective Williams if he had sent the wallpaper and smear samples to the FBI lab for analysis. Detective Williams answered in the affirmative.

The state on redirect examination asked Detective Williams whether the serology tests confirmed that the blood was human. The defendant objected to the question, claiming that when the state had Special Agent Vick on the stand it failed to ask the question, and thus Detective Williams should not be allowed to answer.

The state asserted that Detective Williams should be allowed to answer because defendant waited to ask the question until the FBI agent could not be recalled to answer questions about those tests. According to the state, defendant's action was intended to mislead the jury. The state argued that admission of the results through Detective Williams was the only way to correct the problem. The trial court overruled the objection. It reasoned that defendant opened the door by asking "whether the articles had been sent to the FBI for testing." We disagree. Detective Williams's testimony about the serology test results is not covered by a hearsay exception.

 We must now address the question of whether the trial court's error was harmless. If there is a "reasonable possibility that the error complained of contributed to the conviction," then the error is not harmless. *State v. von Bulow*, 475 A.2d 995, 1013 (R.I.1984) (quoting *State v. Robalewski*, 418 A.2d 817, 824 (R.I.1980)). When the evidence admitted is "cumulative and of minimal significance," then the error is harmless. *Clarke v. Ellerthorpe*, 552 A.2d 1186, 1188 (R.I.1989).

At trial Detective Williams testified that he observed blood stains on the walls of the front foyer as he entered the apartment building. As he was ascending the stairs to the second floor, he noticed a blood smear on the right wall at the top of the stairway. In the second-floor community bathroom Detective Williams saw blood stains on the window curtain, on Willard's leather wallet lying on the floor next to the toilet, and on a stick located behind the radiator. He observed a blood-stained white rag lying in the second-floor hallway. On the third floor, Detective Williams testified, he noticed a blood stain on the doorframe to apartment 18 and a blood-stained white rag lying on the floor of the apartment. Photographs of each blood-stained item that Detective Williams looked at, with the exception of the blood smear at the top of the stairway, were admitted as full exhibits.

Detective Williams's testimony about what he saw plus photographs of the crime scene provided corroboration of Sheed's testimony. Testimony about the test results merely confirmed the obvious, that the blood stains as testified to by Williams without objection as being found on the walls of the foyer and on the doorframe to apartment 18, were human blood.

We are satisfied that there is no reasonable possibility that Detective Williams's testimony concerning the serology test results contributed to defendant's conviction. Although testimony about the test results was inadmissible hearsay, it was cumulative and of minimal significance. The evidence of guilt against defendant was overwhelming, and the testimony about the test results merely provided additional cumulative and inconsequential proof. As a result we conclude that the trial court's error was harmless.

### III

The third issue raised is whether the trial court improperly refused to admit into evi-

dence Sergeant Bathgate's summation of what Joanne Rodriguez (Rodriguez) told him about the murder and the second of two statements Gillespie made to police.

The defendant argues that both documents satisfy all the requirements specified in Rule 804(b)(5) of the Rhode Island Rules of Evidence. Therefore, the trial court's refusal to permit admission of the statements into evidence violated both Rule 804(b)(5) and defendant's constitutional right to due process.

The state asserts that the trial court properly excluded the statements from evidence because they are lacking in the guarantees of trustworthiness required under the rules of evidence.

■ When a hearsay statement includes within it additional hearsay, each layer of hearsay must conform with an exception-to-the-hearsay rule in order to be admissible at trial. Rule 805 Rhode Island Rules of Evidence.

Rule 804(b)(5) states the following:

"(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant."

■ At trial defendant sought by motion to admit what it characterized as a witness statement that Rodriguez gave to Sergeant Bathgate. The statement was described as containing exculpatory information that supported defendant's theory that Gomes had killed Willard. The defendant's motion was denied. The trial court noted that the document was merely Sergeant Bathgate's summation of what Rodriguez had told him she had heard from a man called Louie. The trial court concluded that the document contained inadmissible hearsay on top of inadmissible hearsay. We agree.

■ The defendant also sought to admit a statement Gillespie gave to the Providence police on April 15, 1988. In it Gillespie claimed that Gomes showed up at Gillespie's apartment on the morning of the murder with hands full of food and a set of keys. Gomes allegedly told Gillespie that he found Willard in the first-floor hallway and took Willard first to Eddie Cullen's apartment and then to Willard's apartment. The state informed the court that Gomes was available to testify should defendant wish to call him as a witness. The trial court did not admit the statement and recommended the parties consider bringing Gomes in as a witness. We find that the trial court was not in error.

## IV

■ The final issue arises from the trial court's decision not to read to the jury the definition of premeditation set forth in defendant's proposed charge.

The defendant argues that case law requires a definition of premeditation when explaining malice aforethought. The state asserts that the charge given by the trial court adequately covers the law in Rhode Island.

We have said that "[i]t is not reversible error for a trial justice to refuse to give instructions requested by a defendant, as long as the charge given adequately covers the law relating to the request." *State v. Grundy*, 582 A.2d 1166, 1170 (R.I.1990).

Long ago we recognized that premeditation is a conscious design or intent to kill. *State v. Fenik*, 45 R.I. 309, 315, 121 A. 218, 221 (1923).

In the case before us the trial court, during its charge, instructed the jury that "[p]remeditation is defined as a conscientious [sic] design or intent to kill." After completing its jury charge the trial court asked defendant if he had any objections. The defendant asked that the last two sentences of his request No. 11 be read to the jury so as to clarify the definition of premeditation. The last two lines of request No. 11 read as follows: "Premeditation, as an element of murder, means planned or contrived as a scheme ahead of time, before the commission of the fatal act. To be deliberate, there must be a full and conscious knowledge of the purpose to kill." The trial court reviewed both lines and concluded that defendant's proposed definition was not proper.

The instruction given by the trial court adequately covered the law relating to the definition of premeditation. Therefore, the trial court did not err by refusing to give the instruction requested by the defendant. We further note that the substance of the instruction requested by the defendant is encapsulated within the more efficient and less confusing instruction given by the trial court that comported in all respects with the settled law.

For all these reasons the defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the papers of the case are remanded to the Superior Court.