**STATE of Rhode Island**

v.

**Buenaventura FIGUERAS.**

No. 93–149–C.A.

Supreme Court of Rhode Island.

July 7, 1994.

Jeffrey B. Pine, Atty. Gen., Aaron L. Weisman, Asst. Atty. Gen., for plaintiff.

Richard M. Casparian, Public Defender, Paula Rosin, Chief Appellate Atty., Providence, for defendant.

OPINION

SHEA, Justice.

This matter is before the Supreme Court on the defendant's appeal from his conviction of murder in the first degree. We affirm.

The defendant, Buenaventura Figueras, was charged by criminal indictment No. P1/91–3743–A with one count of first-degree murder in the killing of his brother-in-law, Jose Burgos (victim).[1] He was convicted after a jury trial and moved for a new trial. The motion for new trial was denied, and defendant filed a timely appeal. The defendant first argues that the trial court erred by improperly questioning two witnesses. He also asserts that the trial court committed reversible error by failing to honor defendant's request for an instruction to the jury on the elements of second-degree murder.

The relevant trial testimony is as follows. On May 6, 1991, the Providence police department received an emergency call that a possible shooting had occurred at 52 Erastus Street, Providence. Officer Katherine Simoneau (Simoneau) responded and arrived at the scene minutes later where she found a man with multiple gunshot wounds, later identified as the victim, lying across the front seat of a vehicle. The officer was approached by Brunilda Pagan (Pagan), the victim's wife, who through an interpreter told Simoneau that defendant had shot her husband.

Delvis Figueras (Mrs. Figueras), defendant's wife and the sister of the victim, testified that on May 1, 1991, she telephoned the victim and told him that she wanted to leave defendant and return permanently to her native Puerto Rico with her three children. That evening Mrs. Figueras and her children went to the victim's house in Providence, and from there the victim and his wife drove Mrs. Figueras and her children to a cousin's home in Boston, Massachusetts. The victim and his wife then returned to Providence. The victim and his family returned to Boston on May 3, 1991. On May 4, 1991, the victim and

the cousin drove Mrs. Figueras and her children to Logan Airport where they boarded a flight to Puerto Rico. The victim and his family then returned to Providence.

Evangelina Lugo Vega (Vega), the mother of the victim and a resident of Puerto Rico, testified that on May 2, 1991, she received a telephone call from defendant. The defendant asked Vega for the phone number of the cousin in Boston with whom his wife was staying. Fearing for her daughter's safety, Vega told defendant that she did not have the number. She testified that defendant then told her that "Jose [victim] had done something, did something to him. That even if he would be six feet underground he had to pay for it." Vega further testified that she later received a telephone call from defendant's sister, who told Vega "to warn [her] son that he should be careful because [defendant] was looking for a cannon to find him."

Pagan testified that on May 2, 1991, defendant came to their apartment looking for his wife's belongings. He said that he knew that Pagan and the victim had helped his wife leave, and told Pagan that "[she] and Jose are going to have to pay for it." The defendant left the premises after she threatened to call the police.

Pagan further testified that on May 6, 1991, she and her husband awoke at 6:30 a.m. and that her husband left for work as usual at 6:50 a.m. Pagan returned to bed and subsequently heard three gunshots. She looked out her bedroom window and saw defendant shooting into the driver's side window of her husband's automobile, which was in the parking lot across the street. The defendant then fled the scene, and Pagan ran to her husband who lay motionless across the front seat of the vehicle. The police arrived shortly thereafter.

Leyda Gonzalez (Gonzalez), a life-long friend of defendant, testified that defendant arrived at her home around 6 a.m. on May 6, 1991. He told Gonzalez that he was going out to speak with the victim. The defendant returned to the apartment at approximately

---

1. There were multiple spellings of the defendant's name throughout the record. The criminal indictment identified the defendant as Buenventura Figueras, while other documents identi-

fied him as Buena Ventura Figueras. We have used the name Buenaventura Figueras because that was the name used most often and used by defendant's appellate counsel.

7 a.m. and told Gonzalez that he had killed the victim. Gonzalez heard defendant telephone two of his relatives and tell both that he had killed the victim. After the telephone calls and at defendant's request, Gonzalez drove him to New York City, where he took a cab to Atlantic City, New Jersey. Gonzalez denied any knowledge of the shooting when police first interviewed her on May 14, 1991, but eight days later she gave police a statement consistent with her trial testimony implicating defendant in the murder.

The defendant presented no witnesses and did not take the stand. The defense strategy and the clear intent behind the cross-examination of each of the witnesses was to show mistaken identification, or intentional false implication of defendant. At no time did defendant present, or try to elicit through cross-examination, any evidence tending to show that he had suffered from diminished capacity, acted in the heat of passion, or acted without premeditation.

I

The defendant argues that questions posed by the trial justice to two witnesses called by the state warrant reversal of defendant's conviction. The defendant contends that the questions had a prosecutorial tone that deprived him of a fair trial. The trial court interjected the first disputed question during the state's direct examination of Pagan. Pagan was testifying about what she witnessed on the morning her husband was killed when the trial court asked:

"How many times did you see Buenaventura Figueras shoot the gun into the driver's side window of that car?"

The second trial court interrogatory upon which defendant bases his appeal occurred during the cross-examination of Gonzalez. Defense counsel was attempting to impeach Gonzalez by identifying inconsistencies between two statements she gave to police when the trial court asked:

"What you told them on the 22nd of May, was that the truth?"

Defense counsel's objections to both of these questions were overruled.[2]

■ This is not the first case that has required us to review a trial court's examination of witnesses. Long ago this court recognized that "it is sometimes proper and commendable for a judge presiding in a jury trial to interrogate a witness as to relevant matters proper to be presented to the jury." *State v. Amaral*, 47 R.I. 245, 249–50, 132 A. 547, 549 (1926). The *Amaral* court, however, warned judges to exercise caution when questioning witnesses in order to "guard against even the appearance of changing * * * position from that of a judicial officer impartially presiding at the trial to that of a partisan advocate interested in establishing the position of either party." *Id.* at 250, 132 A. at 550. An even earlier opinion of this court stated that the trial justice's duty is "to exercise scrupulous care that the jury should not be influenced in their finding of fact by what they believed to be the opinion of the judge." *State v. Fenik*, 45 R.I. 309, 316, 121 A. 218, 222 (1923).

Our more recent decisions have echoed the same concerns regarding the danger of judicial interrogation of witnesses. *See State v. Evans*, 618 A.2d 1283, 1284 (R.I.1993); *State v. McKenna*, 512 A.2d 113, 116 (R.I.1986); *State v. Giordano*, 440 A.2d 742, 745 (R.I. 1982). In *Giordano* we emphasized the need for caution and stated the narrow parameters within which a trial justice should question witnesses. 440 A.2d at 745. "The trial justice should be certain that his questions will elicit the truth and will clarify a matter which he justifiably feels is a cause for confusion in the minds of the jurors." *Id.* Even if there is a need for clarification, we stated that the trial court "should first allow counsel every opportunity to refine the witness's testimony." *Id.*

■ In the present case both questions posed by the trial court created the appear-

2. The state argues that defendant did not object to the second disputed question with sufficient specificity to present the issue on appeal. We find the grounds for the objection to be clear and, in light of the trial court's admonition to counsel to refrain from voicing the bases of their objections, the defense counsel's general objection sufficiently preserved the second disputed question for appellate review.

ance that the trial court lacked impartiality. It appeared that the trial court assumed that defendant was the murderer when the trial court asked "[h]ow many times did you see Buenaventura Figueras shoot the gun * * * ?" It appeared that the trial court believed the witness's prior statement, which was favorable to the prosecution, when the court asked "[w]hat you told them on the 22nd of May, was that the truth?" Even though some confusion may have existed that prompted the questions, the trial court did not allow counsel every opportunity to refine the witness's testimony. The trial court's attempt to clarify matters was error because it gave the jury the impression that the trial court may have been biased in favor of the prosecution.

A review of the record in its entirety, however, leads us to conclude that these errors were harmless beyond a reasonable doubt. Thirteen witnesses testified during the five-day trial. There was extensive cross-examination of many of the witnesses by defense counsel. In light of the totality of the evidence presented, the trial court's otherwise neutral demeanor throughout the trial, and the curative instructions to the jury not to draw inferences from the trial court's conduct, the questions posed by the trial court could not have contributed to the verdict. See McKenna, 512 A.2d at 116–17 (discussing curative effect of jury charge on questions by trial justice); State v. Dionne, 442 A.2d 876, 885 (R.I.1982) (finding questions by trial justice would be harmless error). Reversal of defendant's conviction on these grounds is not warranted.

## II

The defendant next argues that the trial court erred by refusing to instruct the jury on second-degree murder. He claims that he was entitled to an instruction on the lesser included offense because the jury could have reasonably inferred that he acted without premeditation, with diminished capacity, or in the heat of passion.

It is well established that a criminal defendant is entitled to an instruction on a lesser included offense if such an instruction is warranted by the evidence. State v. Messa, 594 A.2d 882, 884 (R.I.1991) (citing State v. Hockenhull, 525 A.2d 926, 930 (R.I.1987)). An instruction on the lesser charge is necessary only if an actual and adequate dispute exists about the element between the greater and the lesser charges. Messa, 594 A.2d at 884 (citing State v. Brown, 549 A.2d 1373, 1377 (R.I.1988)).

First-degree murder is defined by G.L.1956 (1981 Reenactment) § 11–23–1, as amended by P.L.1990, ch. 284, § 4, as "[t]he unlawful killing of a human being with malice aforethought." This includes murder "perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing." Id. "Any other murder is murder in the second degree." Id. Voluntary manslaughter is an "intentional homicide without malice aforethought [that occurs in] a sudden heat of passion as a result of adequate legal provocation." State v. Kaner, 463 A.2d 1348, 1351 (R.I.1983) (citing State v. Vargas, 420 A.2d 809, 815 (R.I. 1980)). It is a lesser included offense in first-degree murder. State v. Dordain, 566 A.2d 942, 946 (R.I.1989) (citing State v. Casasanta, 29 R.I. 587, 598, 73 A. 312, 317 (1909)). However, the trial court is not required to give an instruction on a lesser offense when such a charge is wholly unsupported by the evidence. State v. Austin, 462 A.2d 359, 366 (R.I.1983).

In the instant action the trial court denied defendant's request for an instruction on second-degree murder because he did not "think this [was] a second degree case at all." The trial court did not err in so doing. In order to have been entitled to a jury charge on second-degree, there must have been minimal evidence produced tending to show that defendant did not act with premeditation. Not a scintilla of evidence was presented that suggested that defendant did not act with premeditation, that he lacked capacity, or that he acted in the heat of passion. To the contrary, there was ample evidence that defendant had threatened to harm the victim and had contemplated the killing of the victim for days before the murder. Additionally, his sole defense was mistaken identity, totally inconsistent with a defense of dimin-

ished capacity or heat of passion. *See State v. Amazeen,* 526 A.2d 1268, 1271–72 (R.I. 1987) (intoxication defense warrants instruction on second-degree murder if evidence shows defendant's will paralyzed by alcohol consumption); *Hockenhull,* 525 A.2d at 928 (trial testimony indicated the defendant, charged with first-degree murder, ingested significant amounts of drugs and alcohol and therefore instruction on voluntary manslaughter warranted); *Austin,* 462 A.2d at 366 (defense of innocence inconsistent with second-degree instruction); *Fenik,* 45 R.I. at 315, 121 A. at 221 (evidence presented that the defendant not in normal mental state at time of killing therefore, jury charge on second-degree murder appropriate).

The state produced ample evidence to support a conviction for first-degree murder. Neither the state nor the defendant produced evidence that would sustain a conviction on a lesser included offense, and therefore, the trial court did not err in refusing to charge the jury on the elements of second-degree murder.

For these reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.