STATE

v.

**Delmer AMAZEEN.**

**No. 86–101–C.A.**

Supreme Court of Rhode Island.

June 2, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Atty. Gen., Providence, for plaintiff.

William Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, Providence, for defendant.

### OPINION

MURRAY, Justice.

The defendant appeals his conviction of murder in the first degree. We affirm.

The last time Brian Dimock saw his mother, forty-nine-year-old Margot Dimock, she was in the company of defendant, sixty-one-year-old Delmer Amazeen, at the Dimocks' house in Wrentham, Massachusetts. That was Monday, November 12, 1984. When someone from the Wrentham State School, where Mrs. Dimock and defendant worked, called on Wednesday morning to find out where Mrs. Dimock was, Brian became very worried. He went up to the school to find defendant.

Brian found defendant, who appeared very shaken, and asked, "[W]here is my mother?" The defendant replied, "I can't be sure. I dropped her off somewhere in Rhode Island near the American Legion Monday night." Brian then went to the Wrentham police station to report his mother missing. He told police he last saw her in the company of defendant.

Officer Jerauld Jillson called the school and asked a security guard there to invite defendant down to the Wrentham police station for questioning. The defendant reported to the station, where he was advised of his rights. He told Officer Jillson that he had dropped Mrs. Dimock off near a Legion hall in Cumberland. Another officer asked defendant if the officers could look in defendant's car. The defendant agreed to let the officers search his car.

Inside the car Officer Jillson discovered a bedspread and a red shirt. The bedspread, as well as carpeting inside the car, appeared to be freshly stained with blood. Officer Jillson again advised defendant of his rights, and told him that he should get a lawyer. Later that day, in the presence of an attorney, defendant confessed in detail to killing Mrs. Dimock in his apartment in Pawtucket, Rhode Island.

The defendant was transferred to the custody of the Pawtucket police. He wrote out his confession that night. The relevant part of that handwritten confession, which was admitted into evidence and read into the record, follows; only minor punctuation changes and paragraph breaks have been added:

"On Monday, November 12, 1984, at approximately twelve noon, I was in Wrentham, Massachusetts, at which time I called up a female friend of mine named Margo Dimock. She asked me to stop over to her home and to also pick up a bottle of vodka.

"I arrived at Margo Dimock's home about 12:15. Margo and I had a few drinks and talked for a couple of hours. The reason that I had called Margo was to ask her to go with me to meet my son who resides in the western part of the state. Instead of going to visit my son, Margo wanted to go shopping at Ann & Hope in Cumberland, Rhode Island.

"After leaving Ann & Hope, we decided to go to the American Legion Post in Cumberland, Rhode Island and see what was going on there because it was Veteran's Day. We arrived at the post in the late afternoon. We sat at a table near the dance floor and had a few more drinks and something to eat. We stayed there for a few hours dancing and drinking. We then left for my place, stopping along the way for another bottle of vodka.

"We then went to my apartment at 72 Mineral Spring Avenue, Pawtucket, where we had a few more drinks and talked. She started making bad remarks

about my girlfriend, Marie, which were untrue. We kept arguing about my relationship with Marie. I then got mad and hit Margo over the head with a hammer. I hit her a couple of times. She then fell back on the bed. I then realized what I had done and took Margo into the shower to revive her. After the cold water was on her, she became semi-conscious.

"She again made more comments about Marie and I punched her in the face. I walked over and got two steak knives from the shelf and stabbed Margo in the chest. While stabbing Margo, the handles of the knives broke off. Margo was still moving at this time so I hit her a few more times with the hammer. I then removed the bloody clothes that Margo had on and washed the blood off of her body.

"I then wrapped her body in two sheets and put the bloody clothes into plastic bags. I then cleaned up the apartment and washed the shower stall down.

"I then lowered Margo's body out of the window to the ground and took her body to the rear of my station wagon and placed the body inside along with her clothes that were in the plastic bag. I knew that Margo was dead before I took her outside.

"After placing Margo's body in my 1976 Toyota, I then drove around Rhode Island and Massachusetts looking for a place to leave the body. While I was driving with the body, my deep thoughts were that I would be stopped by the police and be discovered.

"I should mention that prior to removing Margo's body from my apartment, I dressed Margo in a pair of red P.J.'s.

"I left the body along the roadway about twenty feet in and covered it with leaves. I then left her clothes at another location which I can not describe due to not being familiar with the area where I was. I don't know if the body was left in Massachusetts or Rhode Island due to the fact that I'm not familiar with this area. I then returned to my apartment at 72 Mineral Spring Avenue, Pawtucket."

The defendant was placed in a cell at the Pawtucket police station and the next morning he informed Lieutenant Charles Dolan that he could take the lieutenant to the body of Mrs. Dimock. The defendant told him that the body was in North Attleboro, Massachusetts.

After alerting the proper authorities, Lieutenant Dolan drove defendant to North Attleboro where they were met by police. The defendant then directed the lieutenant up Route 120. The defendant told him to turn right on Holmes Road, and about a mile down directed him to stop the car. The defendant pointed to a pile of leaves and said that the body would be found in the pile. It was.

According to the physician who performed the autopsy, Mrs. Dimock's body was dressed in a violet nightgown-type of garment and her ankles were tied by a blue cloth. There were seven crush-type lacerations on the back of Mrs. Dimock's skull, a one-and-a-quarter-inch cut over her puffy and blue left eye, a bruise on her left cheek, several stab wounds on both arms and three stab wounds in her back. A knife blade was found in her right side.

The physician stated that in his opinion Mrs. Dimock had died from multiple blunt-instrument traumas to the head and multiple stab wounds. Mrs. Dimock's blood-alcohol level at the time of death was .24.

At trial defendant raised the diminished-capacity defense, claiming that he was too intoxicated by alcohol to have formed the specific intent to kill. The trial justice instructed the jury on first- and second-degree murder and told the jury that intoxication may be offered to negate the requisite intent to kill. He did not give a manslaughter instruction as requested by defendant.

The jury convicted defendant of murder in the first degree. On appeal defendant contends that the trial justice erred in not instructing the jury on manslaughter by reason of diminished capacity.

 Murder is the unlawful killing of a human being with malice aforethought. G.L. 1956 (1981 Reenactment) § 11–23–1.

Manslaughter is the unlawful killing of a human being without malice aforethought. *State v. Lillibridge*, 454 A.2d 237, 240 (R.I. 1982). Murder (other than felony murder) requires proof of the specific intent to kill or to cause great bodily harm. Manslaughter does not.

█ Willful, deliberate, malicious and premeditated killings (as well as those falling within the parameters of the felony-murder rule) are murder in the first degree. All other murders are murder in the second degree. Section 11–23–1. The premeditation necessary to establish first-degree murder must have existed for some appreciable length of time before the killing; it must have existed for more than just a moment. *State v. Fenik*, 45 R.I. 309, 315, 121 A. 218, 221 (1923). If it existed only for "a very brief time," the killing is second-degree murder. *Id.*

█ This court has always recognized that evidence of a defendant's voluntary intoxication may be introduced, when the defendant has been charged with a specific-intent crime, to negate the requisite proof of the defendant's specific intent. *State v. Doyon*, 416 A.2d 130, 134 (R.I. 1980). Voluntary intoxication does not serve to excuse the commission of an offense but rather, when it "is of such a degree as to completely paralyze the will" of the defendant, removing his or her "power to withstand evil impulses" and rendering his or her mind "incapable of forming any sane design," evidence of such intoxication allows the jury to convict the defendant of a lesser included, general-intent offense. *State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919).

In *State v. Correra*, 430 A.2d 1251, 1254 (R.I. 1981), we recognized diminished capacity as a defense against specific-intent charges such as murder, noting "that a successful defense of diminished capacity does not free a defendant but instead results in the conviction of a lesser included offense." In so doing, we were persuaded by the reasoning of Judge Leventhal in *United States v. Brawner*, 471 F.2d 969, 999 (D.C. Cir. 1972):

" 'Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility.' " *Correra*, 430 A.2d at 1254.

█ By adopting the diminished-capacity defense, we thus expanded the rule enunciated in *Vanasse, supra*, to allow evidence that a defendant's mental capacity was diminished by reasons other than intoxication to negate the proof of specific intent required to convict a defendant of certain offenses, if those offenses included lesser, general-intent crimes of which the defendant could be convicted instead. Hence, evidence of trauma or mental disease not quite amounting to legal insanity may now be introduced, as intoxication always could, to defend one charged with a specific-intent crime.

In *State v. Hockenhull*, 525 A.2d 926 (R.I.1987), we reversed the second-degree-murder conviction of the defendant because, among other things, the trial justice had failed to instruct the jury on manslaughter by reason of diminished capacity. We pointed out in *Hockenhull* that manslaughter is a lesser included offense in murder prosecutions in which the defendant has adequately raised diminished capacity, due to intoxication or other reasons, as a defense.

█ Manslaughter by reason of diminished capacity, though a type of voluntary manslaughter, differs from the usual formulation of voluntary manslaughter. Ordinarily, voluntary manslaughter requires heat of passion resulting from adequate provocation. Manslaughter by reason of diminished capacity does not. It falls within the "catch-all" concept of voluntary manslaughter: that concept of manslaughter encompassing "all homicides which are nei-

ther murder nor innocent." *Hockenhull*, at 929 (quoting Perkins & Boyce, *Criminal Law*, 102 (3d ed. 1982)). Thus, in murder prosecutions in which it is alleged that the defendant had the specific intent to kill, a successful diminished-capacity defense enables the jury to find the defendant guilty of the lesser included, diminished-capacity form of voluntary manslaughter. It does not enable the jury to find the defendant "not guilty" of his or her homicidal act.

 Before a trial justice is required to give an instruction on manslaughter by reason of diminished capacity the evidence, however minimal, must permit a reasonable jury to find that the defendant, due to his or her diminished capacity, was incapable of forming a specific intent upon which malice could be predicated. And in cases involving a diminished-capacity defense based on voluntary intoxication, a trial justice must give a manslaughter by reason of diminished capacity instruction only if the evidence would permit a reasonable jury to find that the defendant's intoxication so completely paralyzed his or her will that it took from him or her the power to withstand evil impulses and the capacity to form any sane design or intent to kill.

In *Hockenhull* the facts presented a situation in which rational jurors could differ as to whether the defendant, due to his diminished capacity, formed the requisite premeditation or specific intent required to be convicted of first- or second-degree murder. Although the victim in *Hockenhull* died from what can only be characterized as a brutal stabbing, the evidence tended to show that the defendant was extremely intoxicated at the time of the stabbing and had no recollection of his attack. In fact, sometime after the police later found the defendant lying in a fetal position off the side of the road, shaking and only semiconscious, he told them that he loved the victim and that he could not believe she was dead. At 1269. Hence, there existed at least the reasonable possibility that the defendant in *Hockenhull* was acting with a will so paralyzed and a capacity so diminished by drugs and alcohol that it was questionable whether he could have formed

any sane design or intent in carrying out the killing. We therefore held that it was reversible error for the trial justice not to have instructed the jury on manslaughter by reason of diminished capacity. The failure to give such an instruction when warranted and requested, we said, poses the danger that a jury may erroneously convict a defendant of first- or second-degree murder, despite the prosecution's inability to fully prove malice, if the facts are such that the jury will surely want to find the defendant guilty of something. At 1272–1273.

 Conversely, a defendant is not entitled to a charge on a lesser degree of homicide if the evidence could not support a finding by a rational jury on the lesser charge. *Jefferson v. State*, 472 A.2d 1200, 1203 (R.I. 1984). In the case before us, no rational jury could have found that defendant was acting with a will so paralyzed and a capacity so diminished by alcohol to have precluded him from forming any sane design or specific intent in carrying out his killing. By defendant's own confession, he pounded Mrs. Dimock over the head with a hammer, tried to revive her, and after she came to, walked over, got two steak knives, and repeatedly stabbed her. The defendant confessed that the victim "was still moving at this time, so I hit her a few more times with the hammer." When defendant says he saw that Mrs. Dimock was still alive "so [he] hit her a few more times," he is relating by use of the word "so" that he cognitively intended by his actions to extinguish her life. And even if defendant was cognitively impaired due to his voluntary ingestion of alcohol, he could still have possessed the capacity to premeditate and to form the specific intent to kill. *State v. Arpin*, 122 R.I. 643, 664, 410 A.2d 1340, 1351 (1980).

The events occurring immediately after defendant killed Mrs. Dimock also demonstrate beyond all doubt that defendant was acting with specific intent when he killed her. If defendant's will was so paralyzed and his capacity so diminished by alcohol as to render him incapable of forming any sane design, he would not have been able,

just after the killing, to remove the victim's bloody clothes, wash the blood off her body, dress the body and wrap it in two sheets, put the clothes in plastic bags, clean up the apartment and wash down the shower stall, maneuver the body out of a window and lower it to the ground, load the body and the clothes into an automobile, and drive around Rhode Island and Massachusetts looking for a place to leave the body, finally burying it in a pile of leaves.

The defendant's clear memory of the events leading up to the victim's death, the killing itself, and the events subsequent, as well as defendant's ability to exactly locate the body several days later, indicates that he was far from unconscious at the time he killed Mrs. Dimock. He certainly was not suffering from an alcohol-induced "black out."

On these facts, a finding by the jury that defendant did not have the requisite malice aforethought to be convicted of murder would have been irrational. *See State v. Kaner*, 463 A.2d 1348, 1351 (R.I. 1983). Because the evidence did not warrant a verdict of manslaughter by reason of diminished capacity, the trial justice did not err in declining to instruct the jury on manslaughter.

For these reasons the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed. The papers are remanded to the Superior Court.