STATE

v.

Jose Luis RODRIGUEZ.

No. 2001–517–C.A.

Supreme Court of Rhode Island.

May 14, 2003.

Lauren Sandler Zurier/Aaron Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

A bitter feud left the bullet-riddled body of Angel Cruz (Cruz or victim) lying dead on a Providence sidewalk. After a jury trial, the Superior Court convicted Jose Luis Rodriguez (defendant or Rodriguez) of murder in the first degree, of using a firearm when committing a crime of violence, and of carrying an unlicensed weapon. As a result, the trial justice sentenced the defendant to serve two consecutive life sentences for these crimes, in addition to a concurrent ten-year term.

The defendant raises three issues on appeal. First, the trial justice committed prejudicial error, he asserts, when the court delivered an improper *Allen* charge after the jury informed the trial justice that it had reached an impasse in its deliberations. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Second, he contends, his conviction of murder in the first degree and of using a firearm when committing a crime of violence violated the state constitutional prohibition against double jeopardy. Third, the trial justice erred, he suggests, in refusing to instruct the jury on second-degree murder.

Because the court's *Allen* charge was not illegally coercive or prejudicial; because defendant's convictions satisfied the different-crimes test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932); because, in any event, the General Assembly intended the consecutive sentences for the crimes in this case, and, therefore, such punishment did not violate the prohibition

against double jeopardy in article 1, section 7, of the Rhode Island Constitution; and because the evidence did not warrant a jury instruction on second-degree murder, we reject these arguments and affirm the convictions.

## Facts and Travel

On the evening of August 3, 2000, a gunman shot the victim four times, leaving him dead on the sidewalk near the intersection of Almy and Penn Streets in Providence. Among the various trial witnesses, two testified to having observed how this murder occurred and another discussed the antagonistic relationship between the victim and defendant that led to the killing. Devin Frias (Frias), who lived on the corner of Almy and Penn Streets, testified that on the evening of August 3, she heard two gunshots while she was painting her bedroom. She then ran out of her house and observed a white Honda Accord in the middle of the intersection of Almy and Penn Streets. She saw two people in the car and another unidentified man standing outside the car on the driver's side.

At the same time, she also observed the victim, whom she did not know, limping around the corner of her house. Frias said she watched as defendant held a gun in his hand and shot the victim twice. According to her testimony, defendant then jumped into the car, which sped backwards onto Almy Street and then down Penn Street. Frias went over to where Cruz fell and saw that he had been shot in the head and was bleeding. She began yelling out the license number of the departing vehicle and asking that someone call 9–1–1. But she quickly returned to her house after a man asked "[w]ho [was] [expletive] saying that?" Frias testified that she was standing about five feet away from defendant when he shot Cruz and got a "pretty good" look at him, "enough for [her] to recognize his face to this day."

Because she was afraid of becoming a witness, however, the police were unable to locate her until only a week before the trial. Frias later identified defendant from a police-assembled photographic array, saying that she had no doubts about the accuracy of her identification.

The other witness who testified at defendant's trial was Donald Adams (Adams). He contacted the police on September 20, 2000, seeking to trade his knowledge about Cruz's murder to obtain favorable treatment for his cousin on an unrelated charge. Adams had been a friend of defendant for approximately nine months before the night of the August 3 shooting. At first, Adams provided the police with an admittedly false statement because he did not want them to know that, on the evening of the incident, he was attempting to complete a drug transaction on the street where the murder occurred.

Adams testified that he knew at least a month before the shooting that defendant and Cruz had been feuding with each other. Apparently, they were at odds for several reasons, including their interactions with Cruz's girlfriend, Alicia Figueroa. Adams also recalled an incident during which defendant told him that he had a problem with Cruz because Cruz supposedly had "jumped" him. Both in his first and in his later police statements, Adams explained that, a few days before the Cruz murder, he observed defendant inquire about and then try to purchase a handgun from a man called Avelino while all three of them were present in Avelino's home. Adams heard defendant say that he "need[ed] a burner [referring to a gun], so that [he] [could] pop [Cruz]." When Adams asked whom he was referring to, defendant replied "Angel Cruz." Adams testified that he observed Avelino go into the basement, retrieve a "black .380" gun and hand it over to defendant. He then heard de-

fendant say that he would do whatever was necessary to handle this matter because Cruz and his friends had "jumped" him in a park. On another occasion he also heard defendant say that he intended to kill Cruz.

Adams further testified that, on the night of the murder, he was present at the crime scene when he observed a burgundy car drive up, and saw defendant and a black man get out of it and approach Cruz, who was standing on the sidewalk. The car then sped off. Adams saw defendant and the other man walk up behind Cruz and ask, "What now, mother [expletive]?" before Cruz turned around. All three men then began to argue, pushing or shoving each other. Adams then saw defendant pull a gun and point it at Cruz. At that instant, Adams began running up a nearby driveway to the back of a house. He then heard the firing of three or four shots that apparently sounded as if they were all fired from the same gun. After hearing the shots, Adams walked back down the driveway and saw the victim lying on the sidewalk across the street. Although he did not see defendant shoot Cruz or thereafter enter into any vehicle, he testified that he watched as a white Honda drove by him quickly in reverse on Almy Street. Adams identified defendant from a police-assembled photographic array as the person whom he saw point the gun at Cruz immediately before he heard the gunshots.

Cruz's girlfriend, Alicia Figueroa (Figueroa), also testified that defendant and Cruz did not get along with each other. Apparently, defendant had said something to her that caused Cruz to take offense. She testified that one day defendant told her that he was going to shoot Cruz while they were both together in defendant's car. But according to what defendant told her, he did not do so only because Figueroa was present. Allegedly, defendant also told her that a man named Manny was

going to kill Cruz. During the summer of 1999, Cruz apparently suspected that defendant and perhaps others were out to get him because he obtained a bat for protection. Before the August 3 shooting, Figueroa informed Cruz that defendant had said that "they" were going to kill him because Cruz had shot at someone in a car. There allegedly were other previous incidents in which both Cruz and defendant seemed to be on the verge of attacking each other, but, Figueroa explained, defendant always would walk away.

According to the chief medical examiner's testimony, she found four gunshot wounds on Cruz's body, together with associated "stippling." She explained that this is a forensic-pathology term for small gunpowder fragments that become imbedded into the skin of a shooting victim when a gun has been fired at close range. She found stippling on Cruz's right arm, his face, right forehead, and left cheek. One of the shots struck the victim in the upper lip, near the center of his face; another shot apparently entered his abdomen after passing through his left hand, which was covered by a bandana; another ricocheted off a surface, and fragments of that bullet lodged under the skin of the victim's chest; and the fatal shot entered above his left ear before passing through his brain and brain stem. The medical examiner further testified that even though this last bullet wound to Cruz's head was immediately fatal, it was not the first wound he suffered. She explained that the cause of death was bleeding because of the injuries to the abdomen and to the brain, and she opined that the manner of death was homicide. Although the police never recovered the murder weapon, a firearms and tool-marks expert testified that the shooter apparently fired three of the recovered projectile fragments from a .38–caliber–class gun. Under cross-examination, he testified that the fourth projectile was too big to be fired from a .380 caliber semi-

automatic gun and that he could not determine without inspecting it whether the murder weapon had been altered to allow it to fire a larger .38–caliber bullet. Eventually, a three-count indictment charged Rodriguez with: (1) the murder of Cruz in violation of G.L.1956 § 11–23–1;[1] (2) with using a firearm when committing a crime of violence in violation of G.L.1956 § 11–47–3.2(b)(3);[2] and (3) with carrying a pistol without a license in violation of § 11–47–8.[3] A jury found defendant guilty of both counts 1 and 3 and the trial justice found him guilty on count 2.[4] The trial justice then denied defendant's motion for a new trial and sentenced him as follows: to a mandatory term of life imprisonment for his conviction of first-degree murder under count 1; to a consecutive term of life imprisonment for his conviction of using a firearm when committing a crime of violence under count 2; and to a ten-year term of imprisonment concurrent with the sentence on count 1 for his conviction of carrying an unlicensed pistol under count 3.

# I

## The Trial Justice's *Allen* Charge

The defendant argues on appeal that the trial justice should not have given an *Allen*

charge after the jury informed the trial justice that it had "reached an impasse concerning [its] verdict." In a note sent to the trial justice during its deliberations, the jury indicated that it had "a tally of 11–guilty and 1–not guilty." The defendant maintains that the trial justice should have asked the jury whether it thought that further deliberations would prove fruitful before he further charged the jury. The defendant also insists that the supplemental *Allen* charge that the trial justice gave to the jury was unduly coercive and constituted prejudicial and reversible error. He cites several reasons: the court allegedly directed the charge at the one juror who apparently was holding out for a not-guilty verdict; the jury did not ask for the advice that the court ultimately provided concerning how it should proceed in light of the impasse; the court issued its supplemental charge on the afternoon before a major summer holiday; and the wording of the charge exhorted the jury to reach unanimity, thereby precluding the possibility of a plea bargain after a mistrial.

We consider the propriety of the trial justice's supplemental instruction "in

1. General Laws 1956 § 11–23–1 provides, in pertinent part: "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree."

2. General Laws 1956 § 11–47–3.2 provides, in pertinent part:

 "(a) No person shall use a firearm while committing or attempting to commit a crime of violence.
 "(b) Every person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned as follows:
 " * * *

 "(3) Life, * * * if the death * * * of any person (other than the person convicted) results from the discharge of the firearm."

3. Section 11–47–8 provides, in pertinent part:

 "(a) No person shall, without a license or permit issued * * * carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed * * *. Every person violating the provision of this section shall, upon conviction, be punished by imprisonment for not less than one nor more than ten (10) years * * *."

4. The defendant waived his right to a jury trial with respect to count 2, and agreed to submit that count to the trial justice for decision.

its context and under all the circumstances." *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1965) (per curiam); *see also Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 550, 98 L.Ed.2d 568, 577 (1988). In *Allen,* the United States Supreme Court upheld the use of a supplemental instruction (the original so-called *Allen* charge) to a deadlocked jury, even though that charge specifically urged minority jurors to give weight to and consider the majority's views. *Allen,* 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 531; *see also Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 364, 154 L.Ed.2d 263, 269 (2002); *Lowenfield,* 484 U.S. at 237, 108 S.Ct. at 550, 98 L.Ed.2d at 577. When, as here, defendant argues that the *Allen* charge given by the trial justice was unduly coercive, we must consider the particular facts and the circumstances of the case in which the trial justice has provided such a charge. *State v. Souza,* 425 A.2d 893, 900 (R.I.1981). In other words, the approach that a reviewing court should take on appeal in assessing a challenge to an *Allen* charge is the totality-of-the-circumstances test. *Lowenfield,* 484 U.S. at 237, 108 S.Ct. at 550, 98 L.Ed.2d at 577; *see also Early,* 537 U.S. at ——, 123 S.Ct. at 365, 154 L.Ed.2d at 270.

▮▮▮ Although this Court has criticized an *Allen* charge that simply urged the minority to consider the opinion of the majority, *see State v. Patriarca,* 112 R.I. 14, 51–52, 308 A.2d 300, 322 (1973), the *Patriarca* Court recommended that trial justices use the following prophylactic approach to forestall litigation over the validity of Allen charges:

"before deliberation the court may instruct the jury: (1) that in order to return a verdict, each juror must agree thereto; (2) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment; (3) that each juror must decide the case for himself [or herself], but only after an impartial consideration of the evidence with his [or her] fellow jurors; (4) that in the course of deliberations, a juror should not hesitate to re-examine his [or her] own views and change his [or her] opinion if convinced it is erroneous; and (5) that no juror should surrender his [or her] honest conviction as to the weight or effect of the evidence solely because of the opinion of his [or her] fellow jurors, or for the mere purpose of returning a verdict." *Patriarca,* 112 R.I. at 53, 308 A.2d at 322; *see also Souza,* 425 A.2d at 899, 908.

These suggestions, however, were not intended to limit the trial justice's discretion in instructing jurors concerning their obligations and responsibilities. *See Souza,* 425 A.2d at 900. Rather, these standards were intended to serve as a guide to jurors when they are deliberating and attempting to reach a verdict in a criminal case.[5]

▮▮▮ Although trial justices need not adhere to a specifically patterned jury instruction when addressing a deadlocked

---

5. General Laws 1956 § 8–2–38 requires the trial justice to instruct the jury on the law to be applied to the issues raised by the parties. But there is no requirement for the trial justice to deploy particular words when charging the jury. *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988). "The trial justice may instruct the jury in his or her own words as long as the charge sufficiently addresses the requested instructions and correctly states the applicable law." *Id.* As a result, this Court will not focus on a single phrase or a single sentence by itself in a charge; rather, we will examine both the allegedly improper instructions and the rest of the instructions as a whole. *State v. Fernandes,* 783 A.2d 913, 916 (R.I.2001).

jury, all *Allen* charges should be meticulously fair to both the defendant and to the state.[6] Trial justices "must not infringe upon the factfinding province of the jury by coercion or improper suggestion," *Souza*, 425 A.2d at 900, but they may:

"speak to the jury in ordinary conversational terms, frequently without written notes, in order to achieve the maximum effect of communicating ideas through the use of words. Jury instructions are not given in a vacuum. They must relate to the circumstances of the case and, *particularly in respect to supplemental charges, may depend upon the length of deliberation and the questions that have been asked by the jurors.*" *Id.* (citing *State v. Rogers*, 420 A.2d 1363, 1367–68 (R.I.1980)). (Emphasis added.)

With these guideposts in mind, we begin our analysis of this particular *Allen* charge by underscoring what defendant failed to do at trial to preserve the objections he now seeks to raise on appeal with respect to the *Allen* charge. By failing to object at trial to (1) the actual wording of the *Allen* charge that the trial justice gave; (2) the giving of the charge before a major summer holiday; (3) the alleged direction of the charge at the one juror who was holding out for a not-guilty verdict; and (4) the fact that the jury allegedly did not ask for further instructions on how it should proceed before the court provided it with the supplemental charge, defendant failed to preserve these alleged errors for appeal, and thus he is precluded from raising them for the first time with this Court. *See State v. Vega*, 789 A.2d 896, 898 (R.I.2002). "[C]laims of error are deemed waived unless the specific grounds for the claimed error are effectively raised at trial." *State v. Markarian*, 551 A.2d 1178, 1183 (R.I.1988) (citing *State v. McMaugh*, 512 A.2d 824, 830 (R.I.1986)).

During the trial, defendant raised only three specific objections to the *Allen* charge: (1) that the coercive effect of even giving an *Allen* charge was greatly enhanced when, as here, the jurors have disclosed their numerical division to the trial justice; (2) that because the jury's note indicated it had reached an impasse, the trial justice should not have attempted to overcome or circumvent this impasse through a supplemental charge; and (3) that the trial justice should have asked the jury whether it thought that further deliberations would prove fruitful before it gave the jury any supplemental instructions. Because he failed to assert any other objection at trial to the *Allen* charge as given, defendant waived the other objections that he now attempts to assert for the first time on appeal. In any event, we disagree with defendant's contention that the supplemental instructions were unduly coercive or improper in this case under the totality of the circumstances.[7]

6. For example, to the end of moderating any potential prejudice when giving such a supplemental instruction, the Federal Court of Appeals for the First Circuit requires that all *Allen* charges include three elements: (1) an instruction to minority and majority jurors that they should reexamine their own positions; (2) an acknowledgement that all jurors have the right not to agree; and (3) a reminder that the government carries the burden of proving guilt beyond a reasonable doubt. *United States v. Hernandez–Albino*, 177 F.3d 33, 38 (1st Cir.1999).

7. The state contends that defendant only raised objections to the *Allen* charge before it was given to the jury, but not after. After giving the supplemental instruction, however, the trial justice indicated to both parties:

"[t]hat [the] objection [defendant] voiced prior to the Allen charge certainly would suffice for purposes of any issue that need[ed] to be raised on appeal. The record should reflect [that defendant] certainly did object to the [c]ourt's giving the so-called 'Allen charge' prior to the [c]ourt's giving it. The fact that [defendant] did not

After deliberating approximately three hours, the jurors sent a note to the trial justice indicating that they had reached an impasse and that they were deadlocked eleven to one in favor of finding defendant guilty. They asked the trial justice to advise them concerning this situation.[8] After consulting with counsel, the trial justice decided to provide the jury with an *Allen* charge, thereby overruling defendant's three objections to doing so. The trial justice then gave the following supplemental instruction to the jury:

"Well, I'm going to ask you to resume your deliberations in an effort to reach a verdict. I want to tell you that the principal mode provided by our Constitution and laws for deciding a criminal case is by a jury verdict. You should consider it desirable that the case be decided. There's no reason to believe that this case will ever be submitted to a jury more capable, impartial, or intelligent than you are. Furthermore, there is no reason to believe that more or clearer evidence would be produced at a second trial. It's your duty to decide this case, if you can conscientiously do so. Each juror should decide the case for himself or herself but only after an impartial consideration of the evidence with his or her fellow and sister jurors. Don't hesitate to re-examine your views and change your opinion if you are ultimately convinced that it is erroneous.

As I told you before, you don't have to surrender your opinion simply because others may have a different point of view. But, bear in mind, as I told you earlier, you should keep your minds reasonably open with respect to any points in dispute so that you won't be prevented from reaching a unanimous verdict simply because of stubbornness. In any event, you should listen to the views expressed by your fellow and sister jurors with a disposition to reach a verdict, if you can in good conscience do so. Resume your deliberations."

 First, we note that it was the jury—not the trial justice—that was responsible for gratuitously disclosing its exact numerical split to the court. Thus, this is not a case in which the trial justice solicited this information. *See Brasfield v. United States*, 272 U.S. 448, 449–50, 47 S.Ct. 135, 135, 71 L.Ed. 345, 346 (1926) (holding it was reversible error for a federal district judge to ask a deadlocked jury the extent of its numerical division). Accordingly, this disclosure is simply one of the facts that must be considered in evaluating the totality of the circumstances. *Rogers*, 420 A.2d at 1367–68. But it alone did not render the supplemental instructions coercive because the trial justice did not request this information. *Id.* at 1368 (holding that an unsolicited disclosure to the trial justice of the extent of a jury's

---

renew that objection immediately after my having given the *Allen* charge should not in any way disadvantage [defendant]."
Thus, although defendant did not again object after the trial justice gave the *Allen* charge, he preserved his previous objections based on the three points he raised before the trial justice gave the charge because of the trial justice's above-quoted statement. But there is no evidence that defendant otherwise objected to the *Allen* charge as a whole, or to any of the specifics of the *Allen* charge as given.

8. The note to the trial justice stated as follows:

"Your Honor,
We have reached an impasse concerning our verdict. We have a tally of 11–guilty and 1–not guilty. The jury has reviewed/discussed all of the sworn testimonies of the witnesses, examined/discussed the evidence presented and all other pertinent information concerning the trial. It has become evident that no juror will change his/her vote. Please advise! Thank you, * * *."

deadlock will not invalidate a proper *Allen* charge, but rather it will simply be one of the factors "to be considered in the totality of the circumstances").[9]

Second, the trial justice did not direct the *Allen* charge in this case to the one juror who was in favor of a not-guilty verdict. The trial justice exhorted both the majority and the minority jurors to resume their deliberations and to reconsider their views if they thought their original position was erroneous. He also informed all jurors that they were not obliged to change their opinions, but rather, he urged them to keep their minds open to other points of view. If the trial justice had required the jury to reach a verdict or ordered one juror in the minority to change his or her opinion, then defendant's objections to the charge on this basis, had he properly presented them at trial, may well have been meritorious. *Lowenfield*, 484 U.S. at 239–40, 108 S.Ct. at 552, 98 L.Ed.2d at 578–79 (requiring a member of the jury to surrender his viewpoint to reach a verdict was coercive, but merely inquiring about whether jurors believed that further deliberations might be of assistance to return a verdict was appropriate); *Jenkins*, 380 U.S. at 446, 85 S.Ct. at 1060, 13 L.Ed.2d at 958 (holding an *Allen* charge was unduly coercive when the trial judge said to the jury, "[y]ou have got to reach a decision in this case").

Third, the supplemental instructions in this case did not convey to the jury that it had to reach a verdict before the start of the July 4 holiday. Indeed, the trial justice made no mention of the upcoming holiday in his *Allen* charge.

Fourth, upon receipt of the *Allen* charge, the jury continued deliberating for more than an hour, an amount of time that served to undercut defendant's suggestion that a coercive *Allen* charge produced the verdict in this case. In addition, the jury already had deliberated more than three hours before it retired to deliberate again. *United States v. Hernandez–Albino*, 177 F.3d 33, 39 (1st Cir.1999). (holding that no coercion existed when the jury deliberated for one hour after receiving supplemental instructions in addition to a previous two-and-a-half-hour deliberation, and explaining that additional time can be of aid in the process of determining whether the charge was coercive); *Souza*, 425 A.2d at 901 (holding that it was not coercive for the trial justice to give the jurors a time limit for them to try to reach a unanimous verdict, especially when viewing the instructions as a whole and when considering that the jury already had deliberated for two days); *Patriarca*, 112 R.I. at 54, 308 A.2d at 323 (holding that setting a forty-five-minute time limit for the jury to continue deliberating did not prompt guilty verdicts because the jury returned the verdicts before the trial justice set the time limit).

Fifth, the jurors specifically requested advice from the trial justice concerning what they should do in light of their impasse. The note the jury sent to the trial justice clearly stated "Please advise!"— and that is exactly what the trial justice did.

■ Lastly, defendant argues, it was misleading and coercive for the trial justice to state, as he did, that "[t]here's no rea-

**9.** The defendant refers us to *Jackson v. United States*, 368 A.2d 1140, 1142 (D.C.1977) (per curiam), in support of his argument that disclosure of the jury's numerical split was coercive, especially to the lone dissenting juror. But this case is neither binding on this Court nor persuasive in light of *State v. Rogers*, 420 A.2d 1363, 1367–68 (R.I.1980), in which this Court held that an unsolicited disclosure of the jury's numerical split did not invalidate an otherwise proper *Allen* charge.

son to believe that this case will ever be submitted to a jury more capable, impartial, or intelligent than you are." *Compare State v. Boswell,* 73 R.I. 358, 366, 56 A.2d 196, 200 (1947) (holding that an *Allen* charge indicating to the jurors that they were "as well qualified as any other to decide the case" and "that another trial would entail additional expense" was not error) *with Vega,* 789 A.2d at 898 (holding that although a trial justice had erred in assuming that a retrial was inevitable, telling the jury " '[i]f you people don't reach a verdict this case has to be tried again' " was merely harmless error because, taken as a whole, the supplemental instructions were not unduly coercive or unfair). To be sure, the better practice when giving an *Allen* charge would be for the trial justice to indicate that, in the event of a mistrial, a retrial was a distinct possibility—instead of suggesting, as in *Vega,* that it was inevitable if the jury was unable to reach a verdict in the pending case. After all, it is at least theoretically possible that any number of circumstances might obviate the necessity for a retrial, notwithstanding that the jury in the pending case was unable to reach a verdict. These circumstances include a decision by the state not to retry the case or a decision by the defendant to enter a plea. *Vega,* 789 A.2d at 898. But here, unlike Vega, the trial justice did not state in the supplemental instructions that the case would have to be retried again if the jurors were unable to reach a verdict. Furthermore, the trial justice expressly told the jurors that "you don't have to surrender your opinion simply because others may have a different point of view."

Taking into account all the circumstances and specific facts of this case, the trial justice's *Allen* charge was neutral, fair, and not unduly coercive because it simply encouraged the jurors to continue deliberating, to listen carefully to each other's views while respecting individual opinions, and to try to reach a verdict if they could do so "in good conscience." Thus, viewed in its entirety, it did not constitute reversible error.

## II

### Double Jeopardy

The defendant next contends that the trial justice erred in denying his motion to dismiss on grounds of double jeopardy. He directed this motion to the second count of the indictment, the one that charged him with using a firearm while committing a crime of violence (murder). He argues that, in entering judgments of conviction and in sentencing him on both the use-of-a-firearm charge and on the crime of violence itself (murder), the court violated the double-jeopardy bar in article 1, section 7, of the Rhode Island Constitution.[10] The trial justice first held defendant's motion to dismiss in abeyance until the jury returned its verdict. Thereafter, upon hearing arguments for and against the motion to dismiss, the trial justice denied it. He then sentenced defendant to a term of life imprisonment on count 2, to be served consecutively to the life sentence he had imposed for defendant's murder conviction on count 1.

During the trial, defendant conceded that his convictions for murder and for using a firearm during the commission of a crime of violence would not violate the federal guaranty against double jeopardy in the Fifth Amendment to the United States Constitution.[11] On appeal, however,

10. Article 1, section 7, of the Rhode Island Constitution provides, in pertinent part: "No person shall be subject for the same offense to be twice put in jeopardy."

11. The Fifth Amendment to the United States

he argues that article 1, section 7, of the Rhode Island Constitution should be construed to protect "double punishment" for the same criminal conduct. The defendant conceded at trial that the Rhode Island General Assembly had intended to authorize separate, cumulative punishments for individuals who both commit a crime of violence and do so while they are armed. But defendant argues on appeal that regardless of the Legislature's intent, the double-jeopardy bar in the Rhode Island Constitution forbade the imposition of two consecutive sentences for the same single act of criminal misconduct.

Section 11–47–3.2 delineates the crime of "[u]sing a firearm when committing a crime of violence," and subsection (a) explains that "[n]o person shall use a firearm while committing or attempting to commit a crime of violence." [12] Subsection (b)(3) of § 11–47–3.2 provides that "[e]very person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned * * *[for][l]ife * * * if the death * * * results from the discharge of the firearm." The statute further indicates in subsection (c) that "[t]he penalties defined in subsection (b) of this section *shall run consecutively,*

*and not concurrently, to any other sentence imposed * * *.*" (Emphasis added.)

In *State v. Boudreau,* 113 R.I. 497, 503, 322 A.2d 626, 629 (1974), this Court said that the standard for determining whether an accused is in danger of being twice placed in jeopardy for the same offense, in violation of the state constitutional provision precluding such conduct, is the *same* standard that was enunciated in *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309. In that case, the United States Supreme Court said that: "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." [13] *Id.* See also *State v. Doyon,* 416 A.2d 130, 133 (R.I.1980); *State v. Pope,* 414 A.2d 781, 787–88 (R.I.1980); *State v. Innis,* 120 R.I. 641, 654–55, 391 A.2d 1158, 1165 (1978), *vacated on other grounds, Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The United States Supreme Court further indicated that " '[a] single act may be an offense against two statutes; and if each statute requires proof of an additional fact which

Constitution provides, in pertinent part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *."

12. A "[c]rime of violence" is defined in § 11–47–2(2) as: "mean[ing] and includ[ing] any of the following crimes or an *attempt to commit* any of them: murder * * *."

13. The federal Double Jeopardy Clause encompasses three safeguards for individuals accused of a crime. "First, it protects against a second prosecution for the same offense after acquittal. Second, it protects against a second prosecution for the same offense after conviction. Third, it protects against multiple punishments for the same offense." *United*

*States v. Abreu,* 952 F.2d 1458, 1464 (1st Cir.1992). It is this third safeguard that defendant argues is at issue here. But, in that respect, the purpose of the Double–Jeopardy Clause merely "is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas,* 491 U.S. 376, 381, 109 S.Ct. 2522, 2525–26, 105 L.Ed.2d 322, 331 (1989). Thus, with respect to this third safeguard, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535, 542 (1983).

the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'" *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309. Because of the similar wording and purpose underlying the state and federal constitutional provisions on this subject, Rhode Island cases have hewed closely to federal double-jeopardy law when applying the analogous clause in the Rhode Island Constitution. *See, e.g., State v. Grullon*, 117 R.I. 682, 371 A.2d 265 (1977).

In this case, the two crimes in question satisfied the *Blockburger* test for qualifying as distinct offenses. The defendant was charged with violating three separate statutory provisions. Specifically, count 1 accused defendant of murder in the first degree and count 2 accused him of using a firearm while committing a crime of violence, which in this case was murder. Section 11–47–3.2 ("[u]sing a firearm when committing a crime of violence") required proof of a fact (using a firearm) that § 11–23–1 ("[m]urder") did not. Each count required proof of a separate and additional fact that the other did not; to wit: murder and using a firearm, respectively. Thus, count 2 qualified as a separate criminal offense, and the trial justice did not violate Rhode Island's Double Jeopardy Clause when he sentenced defendant on count 2 to a term of life imprisonment, to be served consecutively to the life sentence imposed on count 1.

The defendant additionally asserts on appeal that the crimes of using a firearm when committing a crime of violence and the underlying crime of first-degree murder merge for double-jeopardy purposes. To support this claim, defendant refers us to *State v. Ashness*, 461 A.2d 659 (R.I.1983); *Grullon*, 117 R.I. at 686–88, 371 A.2d at 267–68, and *Boudreau*, 113

R.I. at 502–03, 322 A.2d at 629. The defendants in the aforementioned cases were charged with assault with a dangerous weapon and with possessing a pistol during the commission of a crime of violence or committing a felony with the use of a firearm. *Ashness*, 461 A.2d at 666, *Grullon*, 117 R.I. at 684–85, 371 A.2d at 266–67; *Boudreau*, 113 R.I. at 503, 322 A.2d at 629. This Court considered those crimes to be the same offense because the elements to convict each defendant on the charge of assault with a dangerous weapon were the same exact elements to convict each defendant on the charge of committing a felony with the use of a firearm. *Ashness*, 461 A.2d at 666–67 (explaining that either the charge of assault with a dangerous weapon or the charge of committing a crime of violence while armed had to be dismissed because the combination of the crime-of-violence charge with either the robbery or the assault-with-a-dangerous-weapon count constituted double jeopardy, even if the accused· also was convicted of robbery); *Grullon*, 117 R.I. at 688, 371 A.2d at 268 (holding that the charges of assault with a dangerous weapon and committing a crime of violence while being armed both were based upon the same conduct of the defendant); *Boudreau*, 113 R.I. at 503, 322 A.2d at 629 (holding that the defendant was twice placed in jeopardy in violation of both the Rhode Island and the federal Double Jeopardy Clause because he was charged with assault with a dangerous weapon and with the commission of a crime of violence while armed).

But those cases are distinguishable from this one. Here, the state charged defendant with murder on count 1 and with using a firearm while committing a crime of violence (murder) on count 2. These crimes cannot merge because each required proof of a separate element (murder and using a firearm, respectively) that

the other did not; thus, they constituted separate crimes. Hence, no violation of the state constitutional bar against double jeopardy existed in this case.

Although our analysis of defendant's double-jeopardy argument might well end here, defendant asserts that this Court should again refrain, as we did in *Ashness*, 461 A.2d at 667 n. 11, from applying the United States Supreme Court holding of *Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679, 74 L.Ed.2d 535, 544 (1983), to the facts of this case with respect to the double-jeopardy protection against cumulative punishments. In that case, the United States Supreme Court held that:

"[w]here * * * [the Missouri] legislature specifically authorize[d] cumulative punishment under two statutes, regardless of whether those two statutes proscribe[d] the 'same' conduct under *Blockburger*, a court's task of statutory construction [was] at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Id.* at 368–69, 103 S.Ct. at 679, 74 L.Ed.2d at 544; *see also Ashness*, 461 A.2d at 667 (explaining that either the charge of committing a crime of violence while armed according to § 11–47–3 or the assault with a dangerous weapon charge had to be dismissed because con-

viction under both charges constituted a double-jeopardy violation).

▪▪▪▪▪▪ This Court did not apply the *Hunter* rationale to *Ashness* because, after examining § 11–47–3, which prohibits the commission of a crime of violence while armed, we concluded that the Rhode Island General Assembly did not intend at that time to permit cumulative punishment under these two statutes for actions that constituted the same offense under the *Blockburger* test. *Ashness*, 461 A.2d at 667 n. 11. When this Court decided *Ashness*, § 11–47–3.2(c) did not exist; rather, § 11–47–3 ("[c]arrying dangerous weapons or substances when committing [a] crime of violence") was in effect.[14] The same cannot be said, however, in this case. In *Ashness*, this Court remarked on the absence of any legislative intent to authorize cumulative punishments. *Ashness*, 461 A.2d at 667 n. 11. Even though the offenses in this case satisfy the different-crimes *Blockburger* test, we further hold that even if the two statutes in this case had proscribed the same conduct and, therefore, failed to qualify as separate crimes under *Blockburger*, the rationale of *Hunter* would defeat any double-jeopardy argument because the Rhode Island General Assembly specifically authorized consecutive sentences when a defendant has committed a crime of violence while using a firearm.[15] *See* § 11–47–3.2(c) ("[t]he

**14.** Section § 11–47–3 provides, in pertinent part: "[n]o person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, explosive substance, noxious liquid, gas or substance, or acid."

**15.** Thus, passing the *Blockburger* test is one of two possible ways of overcoming an alleged double-jeopardy problem when the defendant is charged and convicted for conduct that violates different criminal statutes. If the *Blockburger* test is satisfied, then the court can impose separate and cumulative sentences because such sentences can be given

after convicting an accused of two or more crimes that are not the "same" offense under *Blockburger*. *See Hunter*, 459 U.S. at 367–68, 103 S.Ct. at 678–79, 74 L.Ed.2d at 543. But even if the crimes are found to be the "same" under the *Blockburger* test, then the court must examine the challenged statutes to ascertain whether the Legislature intended to authorize cumulative sentencing in the circumstances of the case at bar. If the legislative intent to do so is evident, then, according to the rationale of *Hunter*, the imposition of consecutive sentences under different statutes would not constitute a double-jeopardy violation, regardless of whether both statutes pro-

penalties defined in subsection (b) of this section *shall run consecutively, and not concurrently, to any other sentence imposed* "). (Emphasis added.) In this statutory provision, the General Assembly clearly has expressed its intent that a guilty defendant should receive consecutive sentences. Consequently, the imposition of cumulative punishment under the two statutes does not violate the double-jeopardy clause in the Rhode Island Constitution because the General Assembly specifically has authorized consecutive sentencing in this situation.[16]

## III

### Refusal to Instruct the Jury on the Lesser–Included Offense of Murder in the Second Degree

The defendant's final contention on appeal is that the trial justice erred in refusing to instruct the jury on the lesser-included offense of murder in the second

---

scribe the same conduct under *Blockburger. Id.* "[T]he *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." *Id.* at 367, 103 S.Ct. at 679, 74 L.Ed.2d at 543 (quoting *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275, 282 (1981)). (Emphasis added.) On the other hand, when the legislative intent to provide for cumulative punishment is not clearly expressed or manifest, then a double-jeopardy violation may result if the crimes do not pass muster under the *Blockburger* test. *See State v. Ashness,* 461 A.2d 659, 666–67, 667 n. 11 (R.I.1983).

16. The defendant also asks this Court to join the Supreme Court of Montana in rejecting *Hunter's* rationale. In *State v. Guillaume,* 293 Mont. 224, 975 P.2d 312, 314 (1999), the defendant alleged that application of a weapon-enhancement statute to his felony-assault conviction violated Montana's double-jeopardy provision. The court found that the Montana Constitution's double-jeopardy clause afforded greater protection against multiple punishments for the same offense than did the Fifth Amendment to the United States Constitution, notwithstanding legislative intent to the contrary. *Id.* at 316. The reasoning of *Guillaume,* however, does not apply to the facts of this case. First, we agree with the trial justice's comments when he indicated to defendant at trial: "I think that the Montana statute can be distinguished. * * * It seems to me that the weight of authority—particularly the clarity with which Federal courts have addressed the issue—is quite instructive and, in my view, persuasive as to the double jeopardy issue that you [defendant] raise. And the result, of course, is if followed—if one

follows the Federal Court, is that your motion cannot succeed. * * * I'm going to deny your motion." Second, the Supreme Court of Montana in *State v. Anderson,* 306 Mont. 243, 32 P.3d 750, 753 (2001), restricted the scope of *Guillaume* to "dealing specifically with legislative enactments by which additional punishment was mandated for use of a weapon." In this case, the Rhode Island General Assembly's intent to provide for cumulative punishment is clearly expressed in § 11–47–3.2(c): "[t]he penalties defined in subsection (b) of this section *shall run consecutively, and not concurrently, to any other sentence imposed.*" (Emphasis added.) Thus, the General Assembly has expressed its clear intent for the sentencing court to impose consecutive sentences in this type of case. Lastly, article II, section 25, of the Montana Constitution is worded differently than article 1, section 7, of the Rhode Island Constitution. Montana's double-jeopardy provision states: "[n]o person shall be again put in jeopardy for the same offense previously tried in any jurisdiction." *Guillaume,* 975 P.2d at 314 (quoting article II, section 25, of the Montana Constitution). As we indicated above, *see* note 10, *supra,* Rhode Island's Double Jeopardy Clause and the Federal Double Jeopardy Clause are similarly worded. Even defendant has conceded that the language of article 1, section 7, is essentially the same as the analogous language contained in the Fifth Amendment to the United States Constitution. Thus, we have more reason to look to federal precedents for guidance than does a state such as Montana, whose constitution contains different language in its double-jeopardy clause. For this reason, we decline defendant's invitation to reach the same result as the Montana court did in *Guillaume.*

degree. He insists that the evidence warranted such an instruction. During the trial, defendant sought a jury instruction on second-degree murder, but the trial justice refused to give one, concluding that the evidence at trial did not warrant such an instruction:

> "The defendant also requested I instruct the jury as to second degree murder. I will not do that. I will give only first degree murder. I see no evidence whatsoever in this record that in any way would suggest that a second degree murder instruction is appropriate. All the evidence before me indicates that the defendant armed himself with a weapon prior to the shooting; that there is evidence before the [c]ourt from other witnesses who indicated that the defendant was intent on killing Angel Cruz, and that, in sum and substance, this was a planned, executed shooting on the streets of our city, fully premeditated with malice aforethought, with ample time prior to the shooting attributed to this defendant's intent to kill. So I will not give a second degree murder charge."

A defendant who is on trial for first-degree murder is " 'also on trial for all lesser-included offenses and, thus, [is] simultaneously on trial for [second-degree murder] * * *.' " *State v. Grabowski,* 644 A.2d 1282, 1286 (R.I.1994). "[S]econd-degree murder is a lesser-included offense of first-degree murder." *Id.* at 1285. The distinction between first-and second-degree murder is whether the evidence indicates that premeditation existed for some appreciable length of time before the murder occurred or whether the evidence shows that premeditation, if it existed at all, occurred for just a mere moment before the murder. *Id.; State v. Amazeen,* 526 A.2d 1268, 1271 (R.I.1987); *State v. Myers,* 115 R.I. 583, 591, 350 A.2d 611, 615 (1976). Thus, for first-degree murder to exist, premeditation must have existed for more than just a mere moment. *Amazeen,* 526 A.2d at 1271. But if premeditation existed only for "a very brief time," then the killing is second-degree murder. *Id.* (quoting *State v. Fenik,* 45 R.I. 309, 315, 121 A. 218, 221 (1923)).

Although a person accused of a crime may be found guilty of any lesser-included or "lower" offenses,[17] a defendant has a right to a jury instruction on a lesser-included offense only when the evidence presented at trial warrants such a charge. *State v. Brown,* 744 A.2d 831, 838 (R.I. 2000); *see State v. Cipriano,* 430 A.2d 1258, 1260–61 (R.I.1981); *State v. Brown,* 549 A.2d 1373, 1378 (R.I.1988).

---

17. General Laws 1956 § 12–17–14 provides that:

> "[w]henever any person is tried upon an indictment, information, or complaint and the court or jury, as the case may be, shall not be satisfied that he or she is guilty of the whole offense, but shall be satisfied that he or she is guilty of so much of the offense as shall substantially amount to an offense of a lower nature, or that the defendant did not complete the offense charged, but that he or she was guilty only of an attempt to commit the same offense, the court or jury may find him or her guilty of the lower offense or guilty of an attempt to commit the offense, as the case may be, and the court shall proceed to sentence the person for the offense of which he or she shall be so found guilty, notwithstanding that the court had not otherwise jurisdiction of the offense."

Rule 31(c) of the Superior Court Rules of Criminal Procedure provides that: "[t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." Both § 12–17–14 and Rule 31(c) serve to place a defendant on notice of all lesser-included offenses necessarily included in the stated charge. *See State v. Cipriano,* 430 A.2d 1258, 1260 (R.I.1981).

"[W]e require that a lesser included offense instruction be given when warranted on account of the danger that, absent such an instruction, a jury may erroneously convict a criminal defendant of the principal offense charged, despite the prosecution's inability to prove an element of that offense, when the jury is convinced that the defendant's conduct was criminal." *Brown,* 549 A.2d at 1378 (quoting *State v. Hockenhull,* 525 A.2d 926, 930 (R.I.1987)); *see also Cipriano,* 430 A.2d at 1260–61.

Although only a minimal quantum of relevant evidence is necessary for a lesser-included offense to go to the jury, *State v. Figueras,* 644 A.2d 291, 294 (R.I.1994), a trial justice is not required to instruct the jury on such an offense when the evidence adduced at trial "shows no dispute as to an essential element that distinguishes the greater and the lesser offenses." *Brown,* 549 A.2d at 1378; *see, e.g., Figueras,* 644 A.2d at 294; *State v. Muir,* 432 A.2d 1173, 1175 (R.I.1981); *Cipriano,* 430 A.2d at 1260–61. Therefore, when a defendant challenges the trial justice's refusal to give a jury instruction on a lesser-included offense, this Court will examine the record to determine whether the evidence warranted a jury charge on the lesser-included offense—in this case, murder in the second degree. If the evidence adduced at trial "could not support a finding by a rational jury on the lesser charge," then the failure to instruct the jury on a lesser-included charge does not constitute reversible error. *Amazeen,* 526 A.2d at 1272; *compare State v. Nunes,* 788 A.2d 460, 464 (R.I. 2002) (holding that the trial justice did not err in denying the defendant's request for a second-degree murder instruction because no evidence indicated that premeditation was either momentary or less) and *State v. DePina,* 810 A.2d 768, 778–79 (R.I.2002) (holding that the trial justice's decision refusing to offer a jury instruction

on either voluntary or involuntary manslaughter as a lesser-included offense of murder was not error because the evidence presented at trial failed to establish that defendants acted in the heat of passion, no evidence of other mitigating factors existed, and the defense of misidentification was irreconcilable with involuntary manslaughter); *with State v. Ventre,* 811 A.2d 1178, 1184 (R.I.2002) (holding that the trial justice erred in not instructing the jury on the lesser-included offense of voluntary manslaughter because the defendant's testimony, if believed, offered a sufficient basis for the factfinder to conclude that the defendant was confronted with a brutal attack that placed him in fear of death or serious bodily harm). In any event, the trial justice should not weigh credibility when evaluating whether the evidence warrants charging the jury on a lesser-included offense. *See State v. Mercier,* 415 A.2d 465, 467 (R.I.1980).

In this case, after examining the evidence presented at trial, we hold that the trial justice correctly denied defendant's requested instruction on second-degree murder. There was no evidence presented at trial that would support a finding that defendant murdered Cruz without premeditation or that he shot him on a mere moment's reflection. On the contrary, the overwhelming evidence showed that defendant repeatedly had threatened to harm the victim because he bore a grudge against him. Cruz's girlfriend, Figueroa, testified that defendant and Cruz did not get along because defendant had said something about her that offended Cruz. She also said that defendant told her that before the murder he had restrained himself from shooting Cruz on a previous occasion only because she was present in the same car with them. Adams, defendant's friend, observed defendant trying to buy a .38–caliber gun from Avelino a few days

before the shooting, so that, as defendant put it, he could "pop" Cruz because Cruz and his friends had "jumped" him. Adams also described the murder scene where defendant drove up to the victim along with another man, exited the car, walked up to the victim and said "What now, mother [expletive]?"—while Cruz had his back turned to defendant. The defendant then shot Cruz four times. The fatal shot that entered the left side of Cruz's head, according to the chief medical examiner, could not have been the first one fired because it would have incapacitated him instantly. *Myers,* 115 R.I. at 591, 350 A.2d at 615 (holding that a murder clearly was premeditated when the fatal shots were not the first shots defendant fired). Thus, defendant did not produce even minimal evidence that would have justified a conviction on a lesser-included offense. In this case, it was evident that premeditation existed for more than a mere moment.

We therefore conclude that a jury instruction for murder in the second degree would have been unwarranted. The trial justice, we hold, did not commit any error when he refused to charge the jury in accordance with the defendant's requested instruction.

### Conclusion

For these reasons, we deny the defendant's appeal, affirm the judgment, and remand the papers in this case to the Superior Court.